997 P.2d 436 (2000)
100 Wash.App. 424
STATE of Washington, Respondent,
v.
Mary K. LETOURNEAU, Appellant.
Nos. 42760-1-I, 43461-6-I.
Court of Appeals of Washington, Division 1.
April 17, 2000.
As Amended June 8, 2000.
*438 James E. Lobsenz, Carney Badley Smith & Spellman, P.S., Seattle, Susan K. Howard Ph.D., Brookline, MA, for Appellant.
Ann Marie Summers, King County Prosecutor's Office-Appellate Unit, Seattle, for Respondent.
Mark T. Aoki-Fordham, MacDonald, Hoague & Bayless, Seattle, for Amicus Curiae.
*437 KENNEDY, C.J.
Mary K. Letourneau pleaded guilty to two counts of second degree rape of a child. Her request for a Special Sexual Offender Sentencing Alternative (SSOSA) was granted and the trial court sentenced her to 89 months of total confinement suspended on various conditions, including 3 years of specialized treatment for sexual deviancy. The court ordered that Letourneau have no contact for the maximum term of life with the victim or with any minors without the supervision of a responsible adult having knowledge of the convictions. Letourneau was additionally sentenced to community custody for 2 years, to commence upon completion of the term of confinement, with a condition that she not receive any tangible or intangible property as defined by RCW 7.68.310 that is a direct or indirect result of her commission of the crimesin other words, she was ordered not to profit from publishing or otherwise commercializing the story of her crimes.
The SSOSA was revoked some 3 months later, after Letourneau was discovered in the company of the victim in violation of the no-contact order contained in the judgment and sentence. Letourneau was sent to prison to serve the 89 months of total confinement. Subsequently, the trial court entered two orders modifying and clarifying the judgment and sentence. In the first such order, the trial court directed that in-person contact with minor children, including Letourneau's own biological minor children, be supervised *439 by a responsible adult having knowledge of the convictions who is approved by the Department of Corrections or by the court, but that Letourneau would be permitted to receive mail from and send mail to her children, and to have telephone contact with her children, subject to routine Department of Corrections policy and procedures relating to inmate mail and telephone communications. In the second clarifying order, the trial court ruled that the prohibition against profiting from commercialization related to the offenses was a condition of the judgment and sentence, effective as of the date of sentencing, rather than merely a condition of community custody following Letourneau's release from total confinement.
Letourneau appeals those provisions of her judgment and sentence that require her in-person contact with her own minor children to be supervised (she does not appeal those provisions that restrict her contact with the victim and with minors other than her own biological children) and that prohibit her from profiting from commercialization related to the offenses. We strike the provision that requires Letourneau's in-person contact with her own minor children to be supervised because there is insufficient evidence in the record that such a restriction is reasonably necessary to prevent Letourneau from sexually molesting her children. Moreover, in this particular case, the best interests of Letourneau's minor children with respect to any restrictions to be placed on her contact with them is best determined by the family court, which has jurisdiction over Letourneau and her children in the action for dissolution of the Letourneau marriage, and by the juvenile court in the course of dependency proceedings relating to the children born outside the Letourneau marriage.
We also strike the provision that prohibits Letourneau from profiting directly or indirectly from any commercialization related to her crimes because this is not a "crime-related prohibition" as defined by RCW 9.94A.030(12) and is not otherwise authorized by the statutes governing community custody or supervision applicable to Letourneau's conviction. In crafting the financial gain prohibition, the trial court referenced RCW 7.68, the so-called "Son of Sam" statute, for its definitions of tangible and intangible property. RCW 7.68.310. As a result of this reference, Letourneau challenges the statute as violative of the First Amendment to the United States Constitution and the Washington constitution article 1, sections 5 and 15. We need not address this challenge because our ruling grants Letourneau the specific relief she requested, i.e., vacation of the financial gain prohibition in her judgment and sentence. See also Washington State Coalition for the Homeless v. D.S.H.S., 133 Wash.2d 894, 932, 949 P.2d 1291 (1997) (explaining that courts will decline to decide issues on constitutional grounds when they can be resolved on other grounds).
Moreover, the issue of the constitutionality of the statute is collateral to this appeal given the limited reference to it by the trial court. Letourneau did not seek declaratory relief with regard to her allegations that the statute is facially unconstitutional, nor would an appeal of a sentence in a criminal case provide the best means for such relief. There is nothing to prevent Letourneau or any other person potentially subject to the proscription of RCW 7.68 from seeking declaratory relief under RCW 7.24. And so proceeding assures the presence of all parties with an interest in the issues, particularly the Attorney General on behalf of the State. RCW 7.24.110. In the meantime, striking the restriction from her judgment and sentence ensures that Letourneau will not risk sanctions under her judgment and sentence if she should choose to profit from telling the story of her crimes.
In sum, we strike the following provisions from Letourneau's judgment and sentence: the requirement that her in-person contact with her own minor children be supervised, and the prohibition on her profiting directly or indirectly from any commercialization related to her crimes.

FACTS
In early 1997, the King County Department of Public Safety Special Assault Unit received information that Mary K. Letourneaua 35 year-old sixth grade teacher and mother of four childrenwas having sexual *440 intercourse with V.F., a 13-year-old student at the school where she taught. After further investigation, the State charged Letourneau with two counts of second degree rape of a child under RCW 9A.44.076. On August 7, 1997, she pleaded guilty to the charges. On November 14, 1997, the trial court imposed a standard-range 89-month sentence, ordering Letourneau to confinement in the county jail for 180 days and suspending the remainder of the confinement, conditioned upon her compliance with the SSOSA terms of her judgment and sentenceincluding 3 years of specialized sexual deviancy treatment.
The judgment and sentence ordered Letourneau to have no contact for the maximum term of life with her victim, V.F., or with any minors without the supervision of a responsible adult having knowledge of the convictions. In addition, it imposed various conditions during her community custody term.[1] One of these conditions stated: "Do not profit directly or indirectly from any commercialization related to the offense. Shall not receive any tangible or intangible property as defined by RCW 7.68.310, including any right or interest in such property, which is a direct or indirect result of the defendant's commission of these crimes." Clerk's Papers at 31. Another condition of community custody ordered her to "[h]ave no contact with the victim or any minor-age children without the approval of [her] Community Corrections Officer and mental health counselor." Id. at 30.
On February 3, 1998, less than 2 weeks after Letourneau's release from the county jail, Seattle Police Officer Tod Harris discovered Letourneau alone in her car with V.F. On February 6, 1998, the trial court found that Letourneau had violated the terms of her judgment and sentence by having unsupervised contact with the victim. Consequently, the trial court revoked Letourneau's suspended sentence and ordered her to serve 89 months in the Department of Corrections with credit for the confinement time served during the period of community supervision.
On September 22, 1998, the trial court entered two orders to clarify Letourneau's judgment and sentence. One order stated that the prohibition from profiting directly or indirectly from any commercialization related to the offense of second degree rape of a child was a condition imposed by her judgment and sentence, and was not merely a provision of community custody following her release from total confinement. The other order stated: "In-person contact with minor children including defendant's natural children shall be supervised by a responsible adult who is aware of the defendant's conviction and is approved by the Department of Corrections or this Court." Id. at 249.[2]
Meanwhile, in May of 1997, Letourneau had given birth to her fifth child. In October of 1998, Letourneau gave birth to her sixth child. Each of these children was fathered by the victim, V.F.
Letourneau appeals the provisions in her judgment and sentence ordering her to have no unsupervised in-person contact with her biological children during their minorities, and prohibiting her from financial gain as defined by RCW 7.68.310.

DISCUSSION

I. Crime-Related Prohibitions
RCW 9.94A.120(9)(c)(v) authorizes the trial court to order persons convicted of felony sex offenses to comply with "any crime-related prohibitions" during the period of community custody following release *441 from total confinement. "Crime-related prohibition" is defined as "[a]n order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted, and shall not be construed to mean orders directing an offender affirmatively to participate in rehabilitative programs or to otherwise perform affirmative conduct." RCW 9.94A.030(12). This court reviews crime-related prohibitions for an abuse of discretion. State v. Riley, 121 Wash.2d 22, 37, 846 P.2d 1365 (1993).
The purposes of the Sentencing Reform Act of 1981 (SRA) include imposition of just punishment, protection of the public, and offering the offender an opportunity for self-improvement. RCW 9.94A.010. Although the Legislature has authorized courts to impose crime-related treatment upon felony sex offenders during the period of community custody following release from total confinement, see RCW 9.94A.120(9)-.120(10), this is to further the purposes of public protection and to offer the offender an opportunity for self-improvement. State v. Riles, 135 Wash.2d 326, 341, 957 P.2d 655 (1998). The SRA embodies the Legislature's reservations about the efficacy of coerced rehabilitation offenders may be offered an opportunity to improve themselves and may be prohibited from doing things that are directly related to their crimes but may not be coerced into doing things that are believed will rehabilitate them under the guise of crime-related prohibitions. This is why the Legislature defined "crime-related prohibitions" to include conduct directly related to the crime but to exclude directing the offender affirmatively to participate in rehabilitative programs or otherwise to perform affirmative conduct. State v. Parramore, 53 Wash.App. 527, 529-30, 768 P.2d 530 (1989) (citing DAVID BOERNER, SENTENCING IN WASHINGTON, § 4.5 at 4-6 (1985)). Thus, although the Legislature has specifically granted courts the authority to order convicted felony sex offenders to participate in crime-related treatment, court discretion in this regard remains structured by the purposes of the SRA, and the authority to order sex offenders to participate in crime-related treatment does not signal a wholesale return to the broad discretion judges traditionally had in imposing conditions of probation. For example, courts may order convicted sex offenders to undergo plethysmograph testing incidental to court-ordered sexual deviancy treatment, but may not order such testing where the offender is not ordered into such treatment. Riles, 135 Wash.2d at 344-46, 957 P.2d 655; see also id. at 350, 957 P.2d 655 (concluding that a prohibition on a convicted sexual offender's contact with minors was not justified where the victim was not a minor).
Although the conduct prohibited during community custody must be directly related to the crime, it need not be causally related to the crime. State v. Llamas-Villa, 67 Wash.App. 448, 456, 836 P.2d 239 (1992). For example, this court affirmed a crime-related prohibition requiring a person who was convicted of delivery of marijuana to undergo urinalysis to monitor his use of marijuana, even though his crime did not involve the use of marijuana. Parramore, 53 Wash. App. at 531, 768 P.2d 530. But in the same case, we struck a condition prohibiting that person from consuming alcohol because the State failed to show any connection between his use of alcohol and his delivery of marijuana conviction. Id.
In this case, the trial court had the authority to impose crime-related prohibitions on Letourneau, who was convicted of felony sex offenses. See RCW 9.94A.120(9)(c).120(10)(b). We must decide whether the financial gain and unsupervised in-person contact prohibitions here at issue are crime-related as defined by RCW 9.94A.030(12).

A. Financial Gain Prohibition
Letourneau challenges the condition of her community custody that prohibits her from profiting directly or indirectly from any commercialization related to her crimes. She also challenges the September 22, 1998 order clarifying that this prohibition was a condition of her sentence, and was not limited to her community custody term.
The State concedes that "[a]s a condition of sentence, imposed for the maximum term, the prohibition against financial gain is without statutory authority." Respondent's *442 Br. at 10. Accordingly, the State concedes that the trial court's September 22, 1998 orderwhich the State presented to the trial court to clarify that the financial gain prohibition was a condition of her sentence, and was not limited to her community custody termis invalid. RCW 9.94A.120(9)(c) authorizes restrictions on a sex offender's activities during the term of community custody, and RCW 9.94A.120(10)(c) authorizes an extension of such conditions up to the maximum allowable sentence for the crime where public safety would be enhanced. Because the issue presented hereLetourneau's right to receive and maintain profits for speaking, writing, and publishing about her crimesdoes not affect public safety, we accept the State's concession of error and conclude that the order extending Letourneau's financial gain prohibition beyond the period of community custody is not authorized under RCW 9.94A.120. As a result, we reverse the trial court's clarifying order of September 22, 1998, regarding the financial gain prohibition.
With respect to the condition of her community custody that prohibits Letourneau from profiting directly or indirectly from any commercialization related to her crimes during the term of community custody, it is clear from the record that this condition was initially imposed as part of Letourneau's SSOSA. Letourneau was evaluated extensively by several professionals in connection with her request to be granted a SSOSA. One of her evaluators recommended that Letourneau be prohibited from having contact with the media, including book deals, television dramatizations, or movies throughout the duration of her treatment because, the evaluator opined, Letourneau was using her media notoriety to undermine her SSOSA treatment by persuading herself and others that she is somehow different from (i.e., better than) other sexual offenders, and because, the evaluator further opined, Letourneau was also using her media appearances to further seduce and exploit her victim, as well as to exploit her own children and various other family members located across the United States. The evaluator explained that part of the treatment modality includes group work with significant others in the life of the sexual offender, to help them to become chaperones and to help them to avoid undermining the treatment: "By [Letourneau's] dramatic and seductive [media] interviews she elicited the help of thousands to assist in undermining her treatment. Being the center of attention feeds into her narcissism and undermines her treatment. If treatment is undermined it increases the likelihood of reoffense." Clerk's Papers at 171.
We observe that financial gain was not the focus of the evaluator's recommendation the evaluator wanted Letourneau to be restricted from media and publishing contacts altogether, as part of her treatment programregardless of whether Letourneau profited from telling the story of her crimes. Nevertheless, the sentencing court did not restrict Letourneau from utilizing her media notoriety to tell her storybut only from profiting by telling her story.
However efficacious the financial gain prohibition may or may not have been as one of the conditions of Letourneau's SSOSA, the fact remains that the SSOSA was revoked when Letourneau violated the order that she have no contact with the victim. Although crime-related treatment remains a condition of Letourneau's community custody following her release from 89 months of total confinement, the State does not argue that the financial gain prohibition is incident to her post-confinement crime-related treatment. Instead, the State argues that the restriction is a crime-related prohibition as defined by RCW 9.94A.030(12). The parties have not briefed the question of whether the restriction would be permissible as an element of post-confinement treatment. Accordingly, we will not consider whether the restriction is sufficiently analogous to plethysmograph testing as an adjunct of sexual deviancy treatment to warrant application of the Supreme Court's ruling in Riles to these facts. See Riles, 135 Wash.2d at 344-46, 957 P.2d 655.
The State contends that Letourneau's financial gain prohibition is directly related to her second degree rape of a child crimes because the personality disorders that led Letourneau to commit these crimes have *443 ledand will continue to leadher to aggressively seek media attention. While this may be true, Letourneau was not prohibited from aggressively seeking media attention but only from profiting financially therefrom. The record does not support the supposition that if she cannot profit, Letourneau will cease to aggressively seek media attention to the contrary: according to her evaluator aforementioned, Letourneau seeks media attention for reasons seemingly unrelated to financial gain. Moreover, while the record might support a total prohibition of media contact as a treatment-related prohibition, that is not what the trial court imposed; accordingly, the constitutional implications of such a total prohibition have not been explored for this appeal and need not be addressed.
There is no showing in this record that Letourneau committed second degree rape of a child in order to profit from telling her story. There is no showing in this record that allowing her to profit from commercialization of the story of her crimes increases the likelihood that she will commit the offense again. As we have noted, there is some indication in the record that Letourneau has utilized her media notoriety in order to undermine treatment, and that to undermine treatment increases the risk of reoffense, but there is no showing that Letourneau's motivation for telling her story to the media is connected with a desire for financial gainand that is what the trial court prohibited.
We are not persuaded that this is a proper crime-related prohibition by United States v. Terrigno, 838 F.2d 371 (9th Cir.1988), in which the Ninth Circuit upheld a probation condition on the former Mayor of Los Angeles forbidding her from receiving money for speaking about her crimes of embezzlement and conversion of public funds. Id. at 374. In that case, the Ninth Circuit explained: "We certainly cannot say it is unreasonable to think that the rehabilitation of a person convicted of embezzlement and conversion of public funds will be more effective if she is reminded in a very practical sense that `crime does not pay.'" Id. It also noted: "We think there is likewise a reasonable nexus between the public welfare and preventing her from further exploitation of her previous position of trust by profiting from telling her story." Id. But in Washington, coerced rehabilitation is not permitted under the guise of a crime-related prohibition; indeed, the definition of "crime-related prohibition" specifically excludes orders directing an offender affirmatively to participate in rehabilitative programs. RCW 9.94A.030(12).
Moreover, the Legislature has devised another means of teaching convicted felons that "crime does not pay"by adopting the so-called "Son of Sam" statutes, RCW 7.68.200-.340, inclusive. By passing these statutes, the Legislature intended to advance the "compelling state interests in compensating the victims of crime and in preventing criminals from profiting from their crimes." RCW 7.68.300. These statutes establish the means by which the Legislature has chosen to advance these compelling state interestsby seizing and distributing properties acquired by reason of the convicted person's commercialization of the crime and placing the funds in escrow for payment over to crime victims and for other limited purposes listed in the statute. RCW 7.68.330. To forbid convicted persons from acquiring any such properties in the first place would frustrate a means by which the Legislature has chosen to fund compensation for victims of crime. To uphold the restriction placed on Letourneau as a "crime-related prohibition" would frustrate that same means.
Because we conclude that the condition prohibiting Letourneau from profiting directly or indirectly from any commercialization related to her crimes is not directly related to her second degree rape of a child conviction and that to uphold the prohibition as such would frustrate the purposes of RCW 7.68.200-.340, inclusive, we strike this condition from her judgment and sentence.
B. Unsupervised In-person Contact with Letourneau's Biological Minor Children
Letourneau challenges the provision in her judgment and sentence that prohibits *444 her from unsupervised in-person contact with her biological minor children after she is released from prison, contending that this prohibition is unconstitutional.[3] Letourneau does not challenge the prohibition against unsupervised contact with minors other than her own biological children, and does not request in-person unsupervised contact with her biological children while she is incarcerated.
As an initial matter, although Letourneau repeatedly asserts that the court's orders prohibit her from "all unsupervised contact with her own children for the rest of her life[,]" Appellant's Br. (Children) at 21, none of the court's orders contain such a prohibition. The relevant conditions order her to have no contact for the maximum term of life with "[a]ny minors without the supervision of a responsible adult who has knowledge of this conviction," Clerk's Papers at 25, and to "[h]ave no contact with the victim or any minor-age children without the approval of [her] Community Corrections Officer and mental health counselor." Id. at 30. The trial court's subsequent order clarifying these conditions stated: "In-person contact with minor children including defendant's natural children shall be supervised by a responsible adult who is aware of the defendant's conviction and is approved by the Department of Corrections or this Court." Id. at 249. The court placed no restrictions on Letourneau's in-person contact with her own children after they reach the age of majority.[4]
Our Supreme Court has concluded that limitations on fundamental rights during community custody terms that help prevent the criminal from further criminal conduct for the duration of his or her sentence are constitutional. See, e.g., Riley, 121 Wash.2d at 37-38, 846 P.2d 1365 (limiting a computer hacker's right to associate with other computer hackers). Nonetheless, such limitations must be "reasonably necessary to accomplish the essential needs of the state." Riles, 135 Wash.2d at 350, 957 P.2d 655 (concluding that a prohibition on a convicted sex offender's contact with minors was not justified where the victim was not a minor).
The fundamental right at issue in this case is Letourneau's right to raise her children without State interference. See In re Custody of Smith, 137 Wash.2d 1, 15, 969 P.2d 21 (1998) (recognizing a parent's right to rear his or her children without State interference as a constitutionally-protected fundamental liberty interest) cert. granted sub nom., Troxel v. Granville, ___ U.S.___, 120 S.Ct. 11, 144 L.Ed.2d 842 (1999); see also Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042, 29 A.L.R. 1446 (1923). Letourneau asserts that the trial court limited her contact with her own children because of concerns about what she might say to her children about her crimes.[5] The record lends some support to this assertion based on the reports of various of the SSOSA evaluators, who expressed concern about what Letourneau might say to her children about her crimes. But one evaluator also expressed concern about the possibility that Letourneau might molest her own biological *445 children. Accordingly, we cannot conclude that the sentencing court was only concerned about what Letourneau might say to her children about her crimes.
The State contends that the compelling state interest involved in this case that justifies interference with a fundamental liberty is the State's interest in preventing harm to Letourneau's children. Courts have recognized prevention of harm to children to be a compelling state interest. See, e.g., Prince v. Massachusetts, 321 U.S. 158, 166-67, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Bering v. SHARE, 106 Wash.2d 212, 241, 721 P.2d 918 (1986); In re Dependency of C.B., 79 Wash.App. 686, 690, 904 P.2d 1171 (1995). Thus, we must determine whether the record supports the proposition that prohibiting Letourneau from unsupervised in-person contact with her biological minor children after she is released from prison is reasonably necessary to prevent harm to her childrenspecifically, whether the restriction is reasonably necessary to prevent Letourneau from sexually molesting her own children.
Letourneau has two sons and four daughters who were born between 1984 and 1997. The record contains no evidence of past molestation of any of these children. One evaluator wrote: "Apart from her sexual relationship with [V.F.], there was no evidence available to indicate that Ms. Letourneau has sexually abused any other children ... including her own." Clerk's Papers at 131. This same evaluator also said: "[T]here was no evidence that Ms. Letourneau experiences pedophilia or any other paraphilia. Furthermore, there is no empirical evidence that pedophilia occurs in women." Id. at 132. Another evaluator opined that Letourneau posed no threat of sexually abusing her own children (but expressed some concern for how she might respond to her oldest son's friends). A third evaluator wrote: "I concur... that Ms. Letourneau does not represent a threat to children in general. She is not a pedophile." Id. at 197.
One evaluator opined that Letourneau posed a danger of harm to her own children, however:
In my view Ms. Letourneau is at a risk to reoffend. If she were in a parenting role (as it was in her teaching role) it is inevitable she would "mold" her children's minds based on her distortions as she did with her victim, causing them to see wrong as right  harmful as harmless  ignoble as noble  inappropriate as appropriate.
Sexual offenders who sexually assault children should not be in a position of power over children or other vulnerable persons. The major position of power and influence over children, other than their teacher, is their parent. Society's children should be protected from this sexually offending [woman]. Clearly, Ms. Letourneau's children should be provided the same protection from sexual offenders treated in the community as the rest of society's children.
Id. at 165. This same evaluator also wrote:
Many sex offenders have offended a victim other than their biological child and later offend their own child of the same or opposite sex. I have seen nothing in my evaluation/treatment of Ms. Letourneau that would indicate to me that she is different than the other sex offenders who have been successfully treated in the community."
Id. This evaluator did not, however, opine that Letourneau is a pedophile or that she suffers from any other form of paraphilia. Rather, the evaluator expressed concern that Letourneau had no insight into the harm her conduct had caused her own children:
She continues to believe she was, and is, a `good mother.' She reports that she believes she has not harmed her children, despite the fact that the children are being seen in mental health treatment or that the notoriety around her case (which she has not discouraged) is cause for considerable stress and embarrassment for them."
Id. This same evaluator recommended that Letourneau be prohibited from all media contact because it was undermining her treatment and because she was using the media to exploit her children, going so far as to display one of them on a television program.
Finally, two of the evaluators recommended that the best interests of Letourneau's children be determined after the appointment of suitable guardians ad litem to *446 investigate and report to the court regarding the children's needs. One of these evaluators also recommended that Letourneau, under professional supervision, inform her children in language and concepts consistent with their development, about her offenses, legal circumstances, and the reasons for restrictions on her contact with them and that visitation should be professionally supervised to ensure that she does not mislead or misinform the children. The other evaluator recommended the appointment of a guardian ad litem to investigate Letourneau's ability to nurture and properly parent and protect her children, before any thought is given to returning them to her care, custody, and control.
On this record, we conclude that the State failed to demonstrate that prohibiting Letourneau from unsupervised in-person contact with her biological children during the term of community custody is reasonably necessary to protect those children from the harm of sexual molestation by their mother. The SSOSA evaluators were unanimous in their conclusions that Letourneau is not a pedophile. Even the evaluator who pointed out that many people who molest children unrelated to them later offend against their own children did not opine that Letourneau is a pedophile, and noted specifically that "[a]ll sexual offenders are not alike." Clerk's Papers at 165. We can readily agree with that evaluator that children of sex offenders are entitled to the same protection from being molested by the offender as all other children in society. The Legislature has specifically authorized courts to require offenders who are convicted of a felony sex offense against a minor victim after June 6, 1996, as Letourneau was, to comply with terms and conditions of community placement imposed by the Department of Corrections relating to contact between the sex offender and a minor victim or a child of similar age or circumstance as a previous victim. See RCW 9.94A.120(9)(b)(vi). But this does not mean that either the court or the Department has the authority to place restrictions upon an offender's contact with his or her own biological children who are not of similar age or circumstances as a previous victim, where the restriction is neither a crime-related prohibition within the meaning of that statutory term nor otherwise necessary to protect the offender's biological children from the harm of sexual molestation. The general observation that many offenders who molest children unrelated to them later molest their own biological children, without more, is an insufficient basis for State interference with fundamental parenting rights. There must be an affirmative showing that the offender is a pedophile or that the offender otherwise poses the danger of sexual molestation of his or her own biological children to justify such State intervention. Nothing in this record rises to that level. We strike the provision from Letourneau's judgment and sentence that restricts unsupervised in-person contact with her biological minor children following her release from total confinement.
This is not to say that in-person visitation between Letourneau and her minor children should not be supervised for other reasons unrelated to the danger of sexual molestationthe record supports the proposition that suitable guardians ad litem should be appointed to investigate the children's best interests with respect to the nature and degree of their ongoing relationship with their mother. The record also supports the proposition that professional intervention may very well be necessary to help the children cope with their mother's crimes and attendant notoriety. The record further supports the proposition that Letourneau herself has little if any insight into the needs of her children or as to the damage she has done to them, first by committing her crimes and then by aggressively exposing herself and her children to media notoriety. But these concerns are better addressed outside the confines of the criminal sentencing process, and this is particularly so in light of the revocation of the SSOSA and the termination of Letourneau's sexual deviancy treatment under the auspices of the SSOSA.[6]
*447 The record reflects that proceedings for the dissolution of the Letourneau marriage were taking place during the revocation proceedings. Indeed, there is some indication in the record that the criminal court and family court may have issued or potentially could have issued conflicting orders with respect to at least some of the visitation issues that are now before us in this appeal. The Legislature has provided more appropriate forums than the criminal sentencing process to address the best interests of dependent children with respect to most visitation issuesthe family court in the case of marital dissolution and paternity cases, and the juvenile court in the case of dependency proceedings. It is the business of the criminal courts to protect minor children from being molested by convicted sex offenders by imposing appropriate conditions of community custody designed for that protective purpose. It is the business of the family and juvenile courts to address the best interests of minor children with respect to most other kinds of harm that could arise during visitation with a parent who has been convicted of a crime, including psychological harm that might arise from that parent's communications with the children regarding the crime. To that end, the family and juvenile courts have authority to appoint guardians ad litem to investigate the best interests of minor children and those courts have broad discretion to tailor orders that address the needs of children in ways that sentencing courts in criminal proceedings cannot. Sentencing courts in criminal proceedings must necessarily operate within the limitations on court discretion contained in the SRA. Here, the SSOSA evaluators and the sentencing court were understandably concerned about the welfare of Letourneau's biological children, given the bizarre circumstances of Letourneau's crimes and her attendant notoriety. But the sentencing court erred to the extent that it attempted to address those particular concerns under the auspices of the SRA.
In sum, we reverse the sentencing court's order of September 22, 1998, providing that the financial gain prohibition was a condition of Letourneau's sentence and we strike the financial gain prohibition as a condition of community custody, as well. We also reverse those portions of the judgment and sentence and subsequent clarifying order that restrict Letourneau from unsupervised in-person contact with her minor biological children following her release from total confinement. The remainder of the judgment and sentence and subsequent clarifying orders shall remain in full force and effect. These rulings are without prejudice to such subsequent proceedings as the State might bring under the so-called "Son of Sam" statutes and to such subsequent proceedings as may take place in juvenile or family court with respect to the best interests of Letourneau's minor biological children.
GROSSE and BECKER, JJ., concur.
NOTES
[1] We use the term "community custody" here, rather than "community placement," because Letourneau was convicted of her sex offenses after June 6, 1996. Compare RCW 9.94A.120(10)(a) with RCW 9.94A.120(9)(b). Nonetheless, a term of community custody includes any community supervision, community placement, or legal financial obligations imposed by the Department of Corrections. RCW 9.94A.120(10)(b) -.120(14). The forms utilized by the sentencing court utilize the terms "community placement" and "community supervision." Although Letourneau was convicted after June 6, 1996, the court imposed "community placement" for 2 years, rather than "community custody" for 3 years as provided by RCW 9.94A.120(10)(a).
[2] On July 9, 1998, the court entered an additional clarifying order: "This court has not placed any restrictions on Letourneau's receipt of mail from her children[.] Id. at 73.
[3] For the first time in her Reply Brief, Letourneau asserts that she was denied procedural due process because the trial court gave her no notice that it was going to address the issue of contact with her biological children. Because Letourneau fails to provide any citations to the record or the law to support this argument, and because the State did not have the opportunity to respond to this argument, we refuse to address it. See Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 809, 828 P.2d 549 (1992). We also observe that Letourneau herself raised the issue of whether the sentencing court intended the restrictions against unsupervised contact with minor children generally to include Letourneau's own children. Thus, Letourneau cannot persuasively argue that she had no notice that the court would decide the issue.
[4] Letourneau argues that "cut[ting] her off from all unsupervised contact with her own children for the rest of her life" constitutes cruel and unusual punishment contrary to the Eighth Amendment. Appellant's Br. (Children) at 21. Because her judgment and sentence does not prohibit unsupervised contact with her children for the rest of her life, we reject this argument.
[5] For this reason, Letourneau contends that this prohibition violates her right to free speech under the First Amendment. Because we resolve the appeal on other grounds, we do not address this argument.
[6] It is clear from the record that sexual deviancy treatment is an intensive process that places significant restrictions on virtually every aspect of the offender's life, including intimate family interactions. An offender who requests a SSOSA with the attendant treatment necessarily agrees to abide by these restrictions during the term of treatment. Letourneau is no longer in the SSOSA treatment program. Accordingly, we must focus on the SRA to resolve this appeal and not on the peculiar nature of sexual deviancy treatment under SSOSA.