# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                Respondent,<br><br>       v.<br><br>JASON EARL IULIANO,<br><br>                Appellant. | No. 78535-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: November 12, 2019 |

LEACH, J. — A jury convicted Jason Iuliano of four counts of rape of a child in the third degree and one count of bail jumping. Iuliano appeals, challenging the court's admission of evidence under ER 404(b), imposition of a condition of community custody that prohibits Iuliano from having contact with minors, and imposition of legal financial obligations (LFOs) that the legislature abrogated in June 2018. We remand to strike the criminal filing fee and the LFO interest provision and reconsider the community custody condition prohibiting unsupervised contact with minors but otherwise affirm Iuliano's conviction.

## FACTS

A.W. met Jason Earl Iuliano in the summer of 2015 when she was 15 and Iuliano was 34. At the time, A.W. lived with her father, James West, and his wife,

Amber West,[1] in Snohomish, Washington. Her mother, Khristyanna Wood, lived in Lynwood, Washington, with her son, T.G., her boyfriend, Mark Seely, and Carl Higley, a friend of the family. A.W. stayed with her mother at her home on Wednesdays and every other weekend.

Wood met Iuliano at a birthday party in August 2015. During the party, Wood spoke with her friend Lily Gillis about her suspicions concerning A.W. and her father. Iuliano, who was the father of Gillis's daughter M.I., joined the conversation. He and Amber were friends.[2] He told Wood that he thought he could get information from Amber or James and perhaps help Wood "get to the bottom of it."

Iuliano did get information from Amber about James's sexual abuse of his daughter. He shared this information with Wood over a period of time until she had enough to take the matter to the police. He also encouraged Amber to go to the police with what she knew. She did. Partly due to Iuliano's help, James admitted to raping A.W.,[3] and A.W. was removed from James's home in November 2015 and moved in with her mother and brother.

During this same time, Iuliano also befriended A.W. She was already friends with his daughter M.I., and, as Iuliano was gathering information for Wood, he also began spending more time with A.W. A.W. felt safe with Iuliano,

---

[1] For clarity, we refer to Amber West and James West by their first names.
[2] Iuliano and Amber were romantically involved at the time.
[3] A.W. was sexually abused and raped by her father from the ages of 7 to 15.

and she confided in him. She told him her father had sexually abused her and that it was still going on during the summer and fall of 2015. Iuliano became a friend of A.W.'s family:[4] he spent time at Wood's home with her family, and A.W. and T.G. began spending weekends at Iuliano's home with him and his daughter M.I. A.W. also went to visit Iuliano directly from her father's home, and Wood's boyfriend Seely would occasionally pick A.W. up from Iuliano's when she was due to go to her mother's home.

At first, A.W.'s relationship with Iuliano was one of friendship. Sometime between September and November 2015, their friendship became a romantic sexual relationship. They first had sex in Iuliano's bedroom after M.I. had gone to bed. A.W. and Iuliano had both been drinking and smoking marijuana. A.W. testified that she and Iuliano had sexual intercourse. Afterward, she spent the night in Iuliano's bed but got up early to sneak back into M.I.'s room so that M.I. would not know.

Iuliano and A.W. had sex about 20 times. A.W. testified that she and Iuliano had sex every weekend that she stayed at his apartment. On a couple of occasions, they had sex in the shower.

A.W. and Iuliano attempted to keep their relationship secret. But their demeanor and a handful of incidents raised suspicions among A.W.'s family members. For example, Iuliano attended A.W.'s choir performance in December and brought her a bouquet of flowers with a rose in the center. And when his

---

[4] Iuliano and Wood were sexually involved for part of this time.

own daughter had a recital the following month, Iuliano did not bring her flowers. On another occasion, Iuliano was shopping at a mall with A.W. and her family. Wood noticed they were holding hands. She asked them to stop. Iuliano said it was a father-daughter kind of thing. Around the time of the December holidays, Wood told Iuliano the kids could not stay with him one weekend. He got upset and "bash[ed] in . . . the light . . . outside of the door."

One weekend when T.G. and A.W. were staying with Iuliano, T.G. was in the living room at about 2:30 a.m. when he heard moaning noises. At first, he thought the sound was coming from the TV but, when he heard more, he went to Iuliano's bedroom. T.G., who was 13 at the time, walked in on Iuliano and A.W. naked, in bed, having intercourse. This upset him. He went back to the living room, but then he thought perhaps he was just seeing things, given how late at night it was. So T.G. returned to Iuliano's bedroom a second time, which confirmed for him that he was not imagining anything. At that point, he started screaming at Iuliano to get off his sister. Afterward, Iuliano tried to persuade T.G. not to tell his mother. T.G. was "disgusted" and "disturbed" by what he saw. The next day, he was too uncomfortable to tell his stepfather more than that he and Iuliano had a fight.

T.G. and A.W., along with Carl Higley and his youngest daughter, spent the weekend of January 22, 2016, with Iuliano. On Saturday afternoon, Higley was in the living room when Iuliano announced he was going to take a shower and then walked into the only bathroom in the apartment. Ten or fifteen seconds

later, A.W. followed Iuliano into the bathroom and shut and locked the door. Higley then heard the shower running. Between 10 and 20 minutes later, Iuliano walked out, followed very soon after by A.W. They were both fully clothed, but A.W.'s hair was wet.

Higley knew that Wood was out with friends that day. He texted her because he was concerned about A.W. going into the bathroom with Iuliano and being in there with the shower running. Wood was not in a position to drive. So she asked Higley to send a text to Seely, which he did. Seely did not respond that day but went to Iuliano's Sunday morning to get the children.

The next day, Monday, January 25, 2016, Wood gathered her family for a game of "20 questions," so she could ease A.W. into a conversation about her relationship with Iuliano. But the game did not unfold exactly as Wood had hoped. A.W. became defensive when asked if she had ever done something she was not proud of and if she was hiding anything from her parents. Then, when someone mentioned Iuliano's name, A.W. said, "So what? He's 20 years older than me. I can have sex with him if I want to. It's my body. You can't control me."

Tuesday, Seely searched A.W.'s room and found cards and letters hidden under her mattress. These included love poems, romantic letters, and a Valentine's Day card. Iuliano sent all of them to A.W. In addition to expressing his love and affection for A.W., the cards and letters include references to their sexual relationship. For example, in one letter, Iuliano noted how he hated "the

fact that we have to hide our love from everyone because we would both get into a lot of trouble." He described trying to please himself when A.W. was absent, saying, "I could not finish no matter how hard I tried. . . . It's not the same as . . . having you here so I can please you. It's like my body won't do certain things unless you're with me."

A.W. later provided Wood and Seely screenshots of Facebook conversations she had with Iuliano during the course of their relationship. The State introduced approximately 85 pages of Facebook messages at trial. Among other things, Iuliano complained to A.W. when he learned she was communicating with boys she knew, and he expressed frustration and irritation when Wood refused his request to have T.G. and A.W. over one weekend. He also sent A.W. messages saying he cared about her whole family and envisioned a future with their two families combined, which would give his daughter M.I. a mother she could relate to.[5]

On January 26, 2018, Wood took A.W. to a nearby hospital. There, A.W. met with a sexual assault nurse examiner. A.W. summarized her interactions with Iuliano, saying that he "basically raped me. . . .[H]e supplied me with alcohol and weed, and I took it, basically he raped me, and we took showers together and slept in the same bed."

Within about a week of the meeting with the nurse examiner, Wood obtained a court order prohibiting Iuliano from contacting A.W. On February 9,

---

[5] M.I. is about five years younger than A.W.

2018, in violation of the order, Iuliano arranged to have a pizza delivered to A.W. at her school. Concealed with the pizza and beverages, Iuliano included a cell phone preprogrammed with his number. Iuliano called the school in advance to tell them the pizza was coming. He falsely said he was an uncle of A.W. named Carl Higley. School officials contacted Wood, who recognized the phone number associated with the pizza order as Iuliano's. A police officer went to the school, intercepted the pizza delivery, and discovered the contraband. The officer spoke to A.W. She admitted that she was expecting delivery of a new cell phone from Iuliano along with the pizza.

The State charged Iuliano in December 2016 with two counts of rape of a child in the third degree. The State amended the charges in September 2017 to four counts of rape of a child in the third degree. The court scheduled trial to begin on February 12, 2018, but Iuliano failed to appear. He was arrested a few days later in Idaho and returned to Snohomish County. The State added a count of bail jumping, and the case went to trial on March 12, 2018.

After trial, the jury convicted Iuliano of all counts. The court sentenced him to 60 months on counts 1, 2, and 3; 24 months on count 4; and 14 months on count 5, the bail jumping charge. The court ordered counts 1 through 4 to run concurrently and count 5 to run consecutively to counts 1 through 4. The court also imposed 36 months of community custody to begin after release from confinement. Legal financial obligations imposed by the court included a $500 mandatory victim penalty assessment, a $200 criminal filing fee, and a $100

mandatory DNA collection fee. The court also imposed conditions of community confinement, including a condition that prohibits Iuliano from contacting any minors, including his daughter, without approved adult supervision.

Iuliano appeals.

## ANALYSIS

*ER 404(b) Evidence*

Iuliano contends the trial court abused its discretion by admitting under ER 404(b) evidence of his secret attempt to deliver a cell phone to A.W. at her school. Before trial, Iuliano asked the court to exclude evidence of both the no-contact order and the attempted pizza delivery. The court found that Iuliano's conduct after the purported sexual relationship ended did not contribute to proving his intent at the time of the alleged crimes. The court also agreed that the evidence was much more prejudicial than probative.

The State asked the court to reconsider its decision. After a hearing on the third day of trial, the court admitted the evidence to show Iuliano's intent and motive. The State argued the evidence was admissible to show Iuliano's lustful disposition toward A.W., to corroborate the anticipated testimony of A.W. that she and Iuliano had a secret romantic relationship, to show Iuliano's consciousness of guilt, and to prove that the illicit relationship was not over. The court rejected the argument that the evidence was admissible to show lustful disposition, but it agreed that the evidence tended to show a preexisting illicit relationship between A.W. and Iuliano. The court also found that when the evidence was considered

for its proper purpose the risk of prejudice was not as great as the court had deemed pretrial. The court concluded that the probative value of the evidence on the issues of motive and intent far outweighed its prejudicial effect. The court refused, however, to reconsider its decision to exclude evidence of the no-contact order.

Iuliano argues that the court should not have admitted the evidence of the attempt to deliver a pizza and cell phone to A.W. because intent was not at issue in the case, the evidence was not probative of motive, and the evidence was highly prejudicial, tending to portray Iuliano as a "creepy" person who masquerades as a family member and attempts to communicate with a student in school.

We review a trial court's evidentiary rulings for an abuse of discretion.[6] A trial court abuses its discretion when it makes a manifestly unreasonable decision or bases its decision on untenable grounds or reasons.[7] Abuse of discretion occurs when the trial court's decision is manifestly unreasonable or based upon untenable grounds or reasons, such as the misconstruction of a rule.[8]

We need not decide if Iuliano has shown the court erred in admitting the evidence of his attempt to deliver A.W. a pizza and a cell phone because he has not shown prejudice. We will not reverse due to an error in admitting evidence

---

[6] State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).
[7] Vy Thang, 145 Wn.2d at 642.
[8] State v. Brown, 132 Wn.2d 529, 572, 940 P.2d 546 (1997).

that does not result in prejudice to the defendant.[9] Erroneous admission of ER 404(b) evidence requires reversal only if a reasonable probability exists that the error materially affected the trial's outcome.[10] There is no such probability in this case. The overwhelming evidence of Iuliano's guilt supports our conclusion that the outcome of his trial was not materially affected by the admission of Iuliano's attempt to deliver a pizza and cell phone to A.W. at her school.

To convict Iuliano of rape of a child in the third degree, the State was required to prove the following elements beyond a reasonable doubt: (1) that on a specific date between September 1, 2015, and January 27, 2016, Iuliano had sexual intercourse with A.W.; (2) that A.W. was at least 14 years old but less than 16 years old at the time of the sexual intercourse and was not married to Iuliano; and (3) that A.W. was at least 48 months younger than Iuliano.[11]

The testimony at trial established that Iuliano knew A.W. and her age and that A.W. spent numerous weekends at Iuliano's apartment. A.W. testified in detail concerning their relationship and their sexual encounters. Her brother testified that he walked into Iuliano's bedroom, saw Iuliano and A.W. engaged in sexual intercourse, left the room, and then went back in a second time to be absolutely sure that he wasn't seeing things. Carl Higley testified to watching A.W. follow Iuliano when he went into the bathroom to shower and saw her

---

[9] State v. Thomas, 150 Wn.2d 821, 871, 83 P.3d 970 (2004).

[10] State v. Stenson, 132 Wn.2d 668, 709, 940 P.2d 1239 (1997).

[11] RCW 9A.44.079(1); see also State v. Deer, 175 Wn.2d 725, 731, 287 P.3d 539 (2012).

emerge about 20 minutes later with wet hair. Several eyewitnesses reported seeing Iuliano and A.W. behave in ways that caused them concern at the time. Finally, A.W. read from cards and letters Iuliano sent her that included romantic love poems and plain references to their sexual relationship.

This evidence was more than sufficient to support the jury's verdict. Iuliano does not establish, within a reasonable probability that error, if there was any, in admitting evidence of the attempt to deliver a pizza and cell phone to A.W. materially affected the outcome of the trial. Admission of the evidence was harmless.

*Community Custody Condition*

Iuliano challenges the imposition of a condition of community custody that prohibits him from initiating or prolonging contact with minor children without supervision by an adult who has been approved by his community corrections officer because it makes no exception for his daughter, M.I., who was 12 at the time Iuliano was sentenced. Iuliano specifically asked the trial court not to prohibit contact with all minors. He argues that because there is no evidence he has ever harmed or sexually abused his daughter or is a pedophile, the condition is insufficiently crime-related and impermissibly infringes on his constitutional right to parent.

The Sentencing Reform Act of 1981[12] authorizes the trial court to impose discretionary crime-related prohibitions and affirmative conditions during a period

---

[12] Ch. 9.94 RCW.

of community custody.[13] A "crime-related prohibition" is an order prohibiting conduct that directly relates to the circumstances of the crime for which the defendant has been convicted.[14] We review imposition of a crime-related prohibition for abuse of discretion.[15] We reverse only if the decision was manifestly unreasonable or based on untenable grounds.[16]

The imposition of an unconstitutional condition of community custody is manifestly unreasonable.[17] Community custody conditions interfering with a parent's fundamental constitutional right to parent may be imposed, but they must be "sensitively imposed" and "reasonably necessary to accomplish the essential needs of the State and public order."[18] Put differently, because of the constitutional implications, we apply strict scrutiny in reviewing an order that impinges on the constitutional right to parent.[19] To withstand strict scrutiny, the order must be narrowly tailored to serve a compelling State interest.[20]

The State contends that a restriction on Iuliano's right to parent is appropriate if the record includes evidence that his daughter has been harmed, directly or indirectly, by Iuliano's criminal conduct and if the restriction imposed is no more than is necessary to address the risk of harm in the future. The

---

[13] RCW 9.94A.505(9); RCW 9.94A.703.
[14] RCW 9.94A.030(10).
[15] State v. Williams, 157 Wn. App. 689, 691, 239 P.3d 600 (2010).
[16] Williams, 157 Wn. App. at 691.
[17] State v. Sanchez Valencia, 169 Wn.2d 782, 792, 239 P.3d 1059 (2010).
[18] State v. Warren, 165 Wn.2d 17, 32, 195 P.3d 940 (2008).
[19] State v. Schimelpfenig, 128 Wn. App. 224, 226, 115 P.3d 338 (2005) (citing Shapiro v. Thompson, 394 U.S. 618, 630-31, 634, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969)).
[20] Schimelpfenig, 128 Wn. App. at 226.

restriction is appropriate here, according to the State, because (a) the victim, A.W., was only a few years older than Iuliano's daughter, M.I., (b) Iuliano was not particularly discreet despite his overall efforts to keep the relationship a secret, and (c) M.I. had become suspicious of the relationship, and Iuliano responded by attempting to "throw her off the trail." The State argues that the closeness in age between A.W. and M.I. (five years) could desensitize M.I. to accepted social mores toward sexual conduct and that witnessing the relationship could be harmful to M.I. the same way witnessing domestic violence is harmful to children.

Iuliano argues that the prohibition of unsupervised contact with his daughter is as unwarranted in his case as it was in the Letourneau[21] case. In Letourneau, the defendant had a sexual relationship with a 13-year-old student in her class. We concluded that the State failed to demonstrate that prohibiting unsupervised contact with her own children was necessary to protect them from being molested by their mother.[22] As in this case, the record included no evidence that Letourneau had ever molested her children or any other children besides the victim.[23] Nor did it include any evidence that Letourneau was a pedophile.[24] But Letourneau has an important difference. There, the trial court had access to detailed reports prepared by at least three sexual deviancy evaluators.[25] Here, the record contains no evidence that Iuliano has had a

---

[21] State v. Letourneau, 100 Wn. App. 424, 441, 997 P.2d 436 (2000).
[22] Letourneau, 100 Wn. App. at 441-42.
[23] Letourneau, 100 Wn. App. at 439.
[24] Letourneau, 100 Wn. App. at 439.
[25] See Letourneau, 100 Wn. App. at 438-43.

sexual deviancy evaluation or that he will be evaluated any time before his release. The trial court had very little evidence to consider in making a determination of the potential danger Iuliano might pose to his daughter.

Letourneau also provides instruction on the extent to which a sentencing court can meaningfully address the range of harms that could arise during visitation with a parent like Iuliano. In Letourneau, this court confined itself to considering if the community custody condition was reasonably necessary to protect her children from being molested by Letourneau.[26] Although we concluded that the prohibition on unsupervised contact was unnecessary, we also noted that "[t]his is not to say that in-person visitation . . . should not be supervised for other reasons unrelated to the danger of sexual molestation" because the evidence revealed a number of compelling concerns about Letourneau's relationship with her children.[27] Those concerns, however, "are better addressed outside the confines of the criminal sentencing process."[28]

We agree with Iuliano that the record contains no evidence showing his daughter is at risk of being sexually abused by him. We cannot presume the constitutional validity of the prohibition on unsupervised contact with minors to the extent it includes his daughter.[29] The trial court did not provide a rationale for its determination that this condition is reasonably necessary to accomplish the

---

[26] Letourneau, 100 Wn. App. at 442-43.
[27] Letourneau, 100 Wn. App. at 442.
[28] Letourneau, 100 Wn. App. at 442.
[29] State v. Bahl, 164 Wn.2d 739, 753, 193 P.3d 678 (2008).

essential needs of the State and public order.[30] Considering the necessarily fact-specific nature of crime-related prohibitions, however, we decline to modify the trial court's sentencing decision. We note, in this regard, that at sentencing, when asked by defense counsel to modify the condition prohibiting Iuliano from remaining overnight in a residence where minor children live or are staying, the court agreed to allow Iuliano to stay overnight in a residence with his daughter if recommended by his treatment provider and brought to the court's attention by Iuliano's community corrections officer. On this record, we conclude that the more appropriate remedy is to remand to the trial court for reconsideration of the condition in light of Iuliano's fundamental right to parent and the State's interest in protecting M.I. from sexual abuse and the requirement that any conditions on Iuliano's right to parent must be narrowly tailored to serve a compelling State interest.

*Legal Financial Obligations*

Iuliano asserts the court should not have imposed a criminal filing fee LFO or ordered that interest accrue on LFOs assessed at sentencing. The $200 criminal filing fee was mandatory under RCW 36.18.020(2)(h) at the time of Iuliano's sentencing. The statute was amended in 2018 to prohibit imposing this fee on indigent defendants.[31] The amendment went into effect on June 7, 2018, three weeks after Iuliano was sentenced. But the Supreme Court held in State v.

---

[30] Nor did the presentence report.
[31] LAWS OF 2018, ch. 269, § 17(2)(h).

Ramirez[32] that the LFO amendments of 2018 apply prospectively to cases that were pending on direct review and thus not final when the amendments took effect. The parties agree that Iuliano has shown he is indigent as that term is defined in RCW 10.101.010(3), and the State concedes the $200 filing fee should be stricken.

Iuliano also challenges the accrual of interest on the nonrestitution LFOs imposed. Amendments in 2018 to RCW 10.82.090 eliminated the accrual of interest on legal financial obligations other than restitution,[33] and Ramirez also applies to these amendments. The State does not object to striking the provision requiring the accrual of interest on the nonrestitution LFOs imposed on Iuliano.

## CONCLUSION

We affirm Iuliano's conviction. We remand to the trial court to reconsider the community custody condition prohibiting unsupervised contact with minors to the extent it includes Iuliano's daughter and to strike the criminal filing fee and the provision imposing interest on LFOs.

WE CONCUR:

---

[32] 191 Wn.2d 732, 747, 426 P.3d 714 (2018).
[33] LAWS OF 2018, ch. 269, § 1.