FILED
COURT OF APPEALS
DIVISION II

2013 APR -9 AM 9: 03

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42495-9-II |
| Respondent, | |
| v. | |
| JASON LEE MARTIN, | UNPUBLISHED OPINION |
| Appellant. | |

QUINN-BRINTNALL, J. — On February 9, 2011, the State charged Jason Martin with two counts of first degree child rape and one count of first degree child molestation for allegedly sexually assaulting his daughter, T.M. RCW 9A.44.073, .083. Pursuant to an *Alford/In re Barr* plea,[1] Martin pleaded guilty on July 22, 2011, to two counts of first degree abandonment of a dependent person. RCW 9A.42.060(1). After colloquy with Martin and discussion with defense counsel and the State, the trial court accepted Martin's guilty plea. Martin now appeals his judgment and sentence arguing that (1) his plea was not made knowingly, voluntarily, and intelligently; (2) the State's actions deprived him of effective assistance of counsel; and (3) the court abused its discretion in imposing a sentencing condition prohibiting Martin from having contact with minors. We affirm.

---

[1] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970); *In re Barr*, 102 Wn.2d 265, 684 P.2d 712 (1984).

FACTS

BACKGROUND

On September 21, 2010, Child Protective Services (CPS) placed Martin's children, seven-year-old twins E.M. and T.M., into protective custody to live with their maternal grandmother. Once in protective custody, the grandmother reported that the children had disclosed ongoing abuse and neglect. T.M. disclosed that Martin had got into bed with her while wearing only his underwear and that while she could not remember any touching, she had blood in her urine the next day.[2] Both children reported that Martin "slapped and hit them, locked them in their rooms and left them home alone" and E.M. disclosed that Martin purposely burned him twice with cigarettes. Clerk's Papers (CP) at 3.

A social worker met with the twins on December 2, 2010. E.M. showed the social worker burn marks he said he received from Martin's cigarettes. T.M. showed the social worker marks on her legs she attributed to abuse by Martin and told the social worker that Martin had "touched her bottom with his hand." CP at 3. The children took part in a forensic interview on December 22. T.M. disclosed that Martin "got on top of her and put his front part inside her front part and it hurt very bad" and that she did not know that grownups had pubic hair until she peeked under the covers and saw Martin's body. CP at 3. E.M. disclosed that he was unsure whether the cigarette burns he received were accidental or because Martin was mad.

_____

[2] The record is unclear but it appears that the children made these disclosures to their maternal grandmother who then reported them to CPS.

Police contacted Martin on February 7, 2011. Martin denied all wrongdoing and claimed that the allegations of abuse were the product of coaching by the children's grandmother.

PROCEDURE

The State initially charged Martin with two counts of first degree child rape and one count of first degree child molestation, all naming T.M. as the alleged victim. RCW 9A.44.073, .083. Pursuant to Martin entering an *Alford/In re Barr* plea, the State amended the charges to two counts of first degree abandonment of a dependent person (one count each for E.M. and T.M.).[3] RCW 9A.42.060(1). Martin pleaded guilty to the abandonment charges on July 22, 2011.

At the plea proceeding, Martin's attorney explained the defense's theory that the abuse allegations "were the result of fabrication" by Martin's mother-in-law who was fighting for custody of the children because of her concern over Martin's (and her daughter's) ongoing substance abuse issues. Report of Proceedings (RP) at 3. Nevertheless, Martin's attorney asked the court to accept the amended charges.

Following the court's acceptance of the amended charges, Martin's attorney explained that

> I have gone over the Statement of Defendant on Plea of Guilty with Mr. Martin. We have talked about the case at length. I have reviewed the discovery. Mr. Martin has reviewed the discovery. I have not conducted the interview of the children or of Mr. Martin's mother-in-law, as I indicated earlier, due to the way negotiations have gone.
> I have talked to Mr. Martin about trial. I have talked to him about in general other cases and the evidence that I have had in those cases, what the jury has done. I talked to him about the constitutional rights that he would be giving

---

[3] A person is guilty of first degree abandonment of a dependent person if (1) the person is the parent of a child (2) who the person recklessly abandons (3) causing the child to suffer great bodily harm. RCW 9A.42.060(1).

up. I have talked to him about the psychosexual evaluation and follow-up treatment, as well as the alcohol and drug evaluation and treatment the State is requiring or recommending. I have talked to him about all of the information that is in the plea statement. I have talked to him about his appellate rights and his one year time limit on collateral attack. I believe that I have answered all of his questions. I believe he's making this plea knowingly, intelligently and voluntarily.

RP at 6-7.

Next, the trial court had a colloquy with Martin concerning the plea agreement. Martin indicated that he understood the amended charges, the consequences of his guilty plea, and the potential length of his sentence. In addition, the court read into the record Martin's addendum to the plea, stating in part,

"I do not admit that I committed the acts that constitute these crimes, but I have reviewed the evidence with my attorney and believe there is a substantial likelihood I would be convicted of the more serious charges if I proceeded to trial. I am pleading guilty in order to take advantage of the State's offer. I understand the Court must find a factual basis for my plea of guilty. I acknowledge there is a factual basis for the charges in the Original Information that is set forth in the Declaration for Determination of Probable Cause. . . . I recognize that I am entering a plea of guilty to a crime that I, in fact, did not commit. My attorney has discussed with me all of the elements of the original charges and the elements of the amended charges, and I understand them all. There is a factual basis for the original charges. I understand the prosecution would be unable to prove the amended charges at trial, but I see pleading guilty to the amended charges as being beneficial to me because it will allow me to avoid the risk of conviction on the charges I would face at trial. Based upon a review of the alternatives before me, I have decided to plead guilty to a crime I did not commit in order to take advantage of the State's offer. I understand the consequences of this plea agreement, and I am making a voluntarily [sic] and informed choice to enter into it."

RP at 12-13.

After concluding that the probable cause declaration provided a sufficient factual basis to support a conviction on the crimes charged in the original information, the trial court accepted Martin's guilty plea and the parties proceeded to sentencing. The State recommended that

Martin be treated as a first-time offender, receive credit for time served (164 days) with no further incarceration, 24 months of community custody, participation in psychosexual and drug and alcohol evaluations, no contact with both E.M. and T.M., and no contact with minors. After noting that the reduction in charges "shocks the conscience," the trial court accepted the State's recommendation, stating that it had to "rely on the judgment of the attorneys who have been working and living with this case for an extended period of time." RP at 23. Accordingly, the trial court sentenced Martin as a first-time offender to 164 days confinement (of time served) and 24 months of community custody.[4] Martin now timely appeals.

DISCUSSION

MARTIN'S GUILTY PLEA

Martin contends that his *Alford/In re Barr* plea was not made knowingly and intelligently because the State conditioned the plea on prohibiting Martin's attorney from interviewing E.M., T.M., and their maternal grandmother and, in result, he lacked the "information needed to make an intelligent choice among the alternative courses of action." Br. of Appellant at 9. Because the record before us reflects that Martin entered his plea knowingly, voluntarily, and intelligently, and because Martin was fully aware that his plea was conditioned on counsel not interviewing the alleged victims when he chose to accept the State's plea offer, we disagree.

---

[4] RCW 9.94A.650(2) and (3) provide that under a "first-time offender waiver," the trial court may "waive the imposition of a sentence within the standard sentence range and impose a sentence which may include up to ninety days of confinement" and "impose up to six months of community custody unless treatment is ordered, in which case the period of community custody . . . shall not exceed one year." Because the trial court imposed a 164-day sentence to insure that Martin received full credit for the time he was already incarcerated before entry of his plea, and because Martin does not challenge the length of his community custody provision, we will not disturb these portions of his judgment and sentence.

We review de novo the circumstances under which a guilty plea was made. *Young v. Konz*, 91 Wn.2d 532, 536, 588 P.2d 1360 (1979). "Due process requires that a defendant's guilty plea be knowing, voluntary, and intelligent." *In re Pers. Restraint of Isadore*, 151 Wn.2d 294, 297, 88 P.3d 390 (2004). A court must allow a defendant to withdraw a guilty plea whenever necessary to correct a manifest injustice. *State v. Taylor*, 83 Wn.2d 594, 596, 521 P.2d 699 (1974). A manifest injustice is one "that is obvious, directly observable, overt, not obscure." *Taylor*, 83 Wn.2d at 596. Our courts recognize four nonexclusive indicia of per se manifest injustice: (1) ineffective assistance of counsel, (2) a defendant's failure to ratify the guilty plea, (3) an involuntary plea, or (4) the State's breach of the plea agreement. *Taylor*, 83 Wn.2d at 597. The burden is on the defendant to show a manifest injustice. *State v. Osborne*, 102 Wn.2d 87, 97, 684 P.2d 683 (1984).

A written plea statement is prima facie evidence that the plea is voluntary when the defendant acknowledges reading and understanding the written statement and that the contents of the statement are true. *State v. Perez*, 33 Wn. App. 258, 261, 654 P.2d 708 (1982). And when the trial court has inquired into the voluntariness of the plea on the record, the presumption of voluntariness is "well nigh irrefutable." *Perez*, 33 Wn. App. at 262.

Here, Martin signed a written plea statement indicating that he was informed of the direct consequences of his plea and that the plea was made in a knowing, intelligent, and voluntary manner. The trial court inquired at length into the voluntariness of the written plea agreement on the record and found that Martin entered into the plea voluntarily. During the plea colloquy, Martin's defense counsel indicated that he and Martin "talked about the case at length," that both

6

he and Martin reviewed the discovery, and that he believed Martin was making the plea in a knowing, intelligent, and voluntary manner. RP at 6. Moreover, the court read Martin's entire plea addendum into the record, including a portion stating, "'I understand the consequences of this plea agreement, and I am making a voluntary and informed choice to enter into it.'" CP at 35. Martin confirmed that this statement was true, that he signed it, and that he adopted the statement as his own.

Under these circumstances, the evidence is "well nigh irrefutable" that Martin's plea was made knowingly, voluntarily, and intelligently. *Perez*, 33 Wn. App. at 262. Martin has failed to allege coercion, mistake, or even misunderstanding. Instead, he asserts that because the prosecutor's office conditioned the plea bargain on prohibiting Martin's counsel from interviewing the victims and their grandmother, the plea was not made intelligently. This argument is not well taken.

Martin was present and represented by counsel during the plea proceeding. Accordingly, he was aware that the prosecutor's office conditioned the plea bargain on his counsel not interviewing the alleged victims. Despite this, Martin still entered a voluntary guilty plea "to take advantage of the State's offer" and "avoid the risk of conviction on the charges" he would face at trial. CP at 35.

Criminal defendants do not have a constitutional right to plea bargains. *State v. Yates*, 161 Wn.2d 714, 741, 168 P.3d 359 (2007), *cert. denied*, 554 U.S. 922 (2008). A plea bargain is a contract. *State v. Mollichi*, 132 Wn.2d 80, 91, 936 P.2d 408 (1997). "[B]oth sides to the agreement must perceive an advantage to entering the bargain." *State v. Moen*, 150 Wn.2d 221,

230, 76 P.3d 721 (2003). "[A] condition insisted on by the State that requires a defendant to give up a constitutional right does not, by itself, violate due process. . . . The theoretical basis for all plea bargaining is that defendants will agree to waive their constitutional rights." *Moen*, 150 Wn.2d at 230-31. As the *Moen* court explained, it is important to distinguish between policies "where the prosecutor's actions might *deter* a defendant from exercising a legal right . . . and cases where the prosecutor's action was in *retaliation* for exercising a right, which violates due process." 150 Wn.2d at 231.

The policy at issue here—protecting young victims of abuse from being confronted and questioned by those who have harmed them—is not a retaliatory policy. Martin's own attorney recognized this at the plea proceedings:

> We have not yet done an interview of either of the two children or of Mr. Martin's mother-in-law. That was part of the negotiations. We don't know what those interviews would have produced. Having done many of these interviews, though, as gentle as I try to be, it is very tough on especially minor children.

RP at 3.

This policy does not run afoul of the state or federal constitutions' due process protections and Martin was aware of the condition when he agreed to the plea. Accordingly, we discern no manifest injustice "that is obvious, directly observable, overt, not obscure" from the circumstances under which Martin entered a guilty plea. *Taylor*, 83 Wn.2d at 596. Martin has failed to establish that his plea was not made voluntarily, knowingly, and intelligently.

INEFFECTIVE ASSISTANCE

Martin alleges ineffective assistance of counsel for the same reason that he argues his plea was not made knowingly: that the prosecutor's office conditioned his plea on his defense counsel not interviewing the victims or their grandmother. Because the State's plea bargain

limiting access to potential witnesses did not preclude defense counsel from providing effective assistance, and the record reflects that Martin's counsel performed both reasonably and competently, we reject this argument.

In order to prove ineffective assistance of counsel, Martin must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). "Effective assistance of counsel includes assisting the defendant in making an informed decision as to whether to plead guilty or to proceed to trial." *State v. A.N.J.*, 168 Wn.2d 91, 111, 225 P.3d 956 (2010) (citing *State v. S.M.*, 100 Wn. App. 401, 413, 996 P.2d 1111 (2000)). Nevertheless, as we stated above, a "defendant does not have a constitutional right to plea bargain." *State v. Wheeler*, 95 Wn.2d 799, 804, 631 P.2d 376 (1981).

Martin argues that his attorney could not properly evaluate the merits of the State's plea bargain because he was not "allowed to engage in sufficient investigation to determine the strengths and weaknesses of the state's case as it exist[ed] at the time of the plea." Br. of Appellant at 13. Martin cites *State v. Burri*, 87 Wn.2d 175, 550 P.2d 507 (1976), *State v. Ulestad*, 127 Wn. App. 209, 111 P.3d 276 (2005), *review denied*, 156 Wn.2d 1003 (2006), and *A.N.J.*, 168 Wn.2d 91, to support this proposition. But none of these cases are on point.

*Burri*, for instance, involved a case where the prosecutor interfered with the *defendant's* alibi witnesses by subpoenaing and interviewing them without defense counsel present then prohibiting them from speaking with the defense. 87 Wn.2d at 178-79. Moreover, the defendant in *Burri* had pleaded not guilty and was preparing for trial. 87 Wn.2d at 176. Martin's case involves none of these circumstances. Similarly unhelpful for Martin, *Ulestad* involved a

situation where the trial court prevented the defendant from communicating directly with counsel while counsel interviewed a victim at trial. 127 Wn. App. at 215. Nothing like this situation exists here and *Ulestad* is clearly inapposite.

Martin cites *A.N.J.* for the proposition that "at the very least, counsel must reasonably evaluate the evidence against the accused and the likelihood of a conviction if the case proceeds to trial so that the defendant can make a meaningful decision as to whether or not to plead guilty." 168 Wn.2d at 111-12. Here, the record indicates that counsel reviewed the discovery evidence with Martin—presumably the forensic interviews of E.M. and T.M. and the allegations themselves—discussed the case (and plea) with Martin at length, and discussed "in general other cases and the evidence that I have had in those cases, [and] what the jury has done." RP at 6. It is unclear what more Martin believes would have been revealed from counsel interviewing the young children or their grandmother. Nevertheless, this case is clearly distinguishable from *A.N.J.* where counsel "spent as little as 55 minutes with [the defendant] before the plea hearing, did no independent investigation, [and] did not carefully review the plea agreement." 168 Wn.2d at 102.

Unlike *Burri*, *Ulestad*, and *A.N.J.*, our recent decision in *State v. Shelmidine*, 166 Wn. App. 107, 269 P.3d 362, *review denied*, 174 Wn.2d 1006 (2012) addressed a highly analogous situation to the one currently before us. In *Shelmidine*, the defendant argued that he was deprived of effective assistance of counsel because the prosecutor's office made its plea offer

10

contingent upon the defense not seeking the identity of a confidential informant. 166 Wn. App. at 109. After evaluating the evidence available to defense counsel, we concluded that "the plea offer did not preclude defense counsel from reasonably evaluating the evidence against Shelmidine and the likelihood of a conviction if the case proceeded to trial. . . . [T]he State's plea offer did not preclude Shelmidine's defense counsel from providing effective assistance of counsel." *Shelmidine*, 166 Wn. App. at 116.

Here, as already noted, Martin's counsel reviewed the available discovery with Martin and talked to him "about in general other cases and the evidence that I have had in those cases, [and] what the jury has done." RP at 6. Between the available forensic interviews of E.M. and T.M., the allegations themselves, and defense counsel's own experiences from taking similar cases to trial, it is clear that defense counsel had sufficient information to advise Martin and assist him "in making an informed decision as to whether to plead guilty or to proceed to trial." *A.N.J.*, 168 Wn.2d at 111. Martin himself admitted after reviewing the available evidence that he believed "there is a substantial likelihood [he] would be convicted of the more serious charges if [he] proceeded to trial." CP at 35.

Our review of the record confirms that defense counsel provided effective assistance.[5] Accordingly, we reject Martin's ineffective assistance of counsel claim.[6]

---

[5] Alternatively, we note that, as in *State v. Zhao*, 157 Wn.2d 188, 203 n.10, 137 P.3d 835 (2006), "[w]e have only very limited information about the Pierce County prosecutor's policy and the record does not contain a copy of the policy." Accordingly, the record does not reveal sufficient facts to evaluate the actual or practical consequences of such policy and Martin's ineffective assistance argument fails on this ground. *Zhao*, 157 Wn.2d at 203.

[6] The trial court clearly considered Martin's counsel effective. In light of counsel's success in negotiating a plea that reduced Martin's potential prison time from an indeterminate life sentence to 164 days of time served (for nonsex crimes), the trial court told Martin that he "should be thankful for the work he's done in this case." RP at 27.

SENTENCING CONDITION

Last, Martin argues that he is "entitled to relief from the requirement that he have 'no contact with minors,' apparently for life." Br. of Appellant at 19. Because the crime for which Martin was convicted involved reckless behavior resulting in great bodily harm to minors, we conclude that the no-contact provision directly relates to the circumstances of the crime of conviction and is, therefore, permissible. Moreover, the trial court clearly indicated that it would retain jurisdiction over this matter and that, in the future, it would reconsider the no-contact provision. Accordingly, Martin's concern that the no-contact order is "apparently for life" lacks merit.

We review a trial court's imposition of a crime-related prohibition for abuse of discretion. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). A trial court abuses its discretion when its decision is manifestly unreasonable, or exercised on untenable grounds or for untenable reasons. *State v. Cunningham*, 96 Wn.2d 31, 34, 633 P.2d 886 (1981).

RCW 9.94A.505(8) states that a sentencing court "may impose and enforce crime-related prohibitions and affirmative conditions as provided in this chapter." RCW 9.94A.030(10) further elaborates that

> "[c]rime-related prohibition" means an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted, and shall not be construed to mean orders directing an offender affirmatively to participate in rehabilitative programs or to otherwise perform affirmative conduct. However, affirmative acts necessary to monitor compliance with the order of a court may be required by the department.

Last, RCW 9.94A.703(3)(b) grants the trial court the discretion to order an offender to "[r]efrain from direct or indirect contact with the victim of the crime or a specified class of individuals" as a condition of community custody.

Here, Martin pleaded guilty to two charges of first degree abandonment of a dependent person. As a result, Martin was convicted of the crime of recklessly abandoning two children in a manner that resulted in great bodily harm to them. *See* RCW 9A.42.060(1). Martin argues that "it would have been proper for the court to order that [he] refrain from taking on any responsibility for providing 'basic necessities of life' to any child," instead of an outright prohibition. Br. of Appellant at 20. But community custody prohibitions need not be "causally related to the crime," just "directly related." *State v. Letourneau*, 100 Wn. App. 424, 432, 997 P.2d 436 (2000). In light of Martin's reckless abandonment of his *own* children—and the great bodily harm such abandonment caused—the trial court's sentencing prohibition was both sensible and directly related to Martin's convictions.

In addition, the trial court clearly indicated that it would retain jurisdiction over Martin and that the no-contact order was open for reconsideration upon Martin successfully undergoing a psychosexual evaluation:

> When [Department of Corrections] cuts loose of their supervision of you, then the Court's going to see where you are and what we need to do as far as whether you need to have continual court supervision. . . .
>
> . . . .
>
> . . . You are not to have any contact with either of the children. No contact with minors. If you get this [psychosexual] evaluation and there is a determination made that it is safe for you to have contact with minors, we can address that issue. Until then, I'm going to be on the side of caution and I am going to impose that condition.

RP at 25-26.

The trial court did not abuse its discretion in ordering the no-contact order which is subject to revision should Martin make such a request and establish that he is safe to be released from that condition.[7] We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

QUINN-BRINTNALL, J.

We concur:

VAN DEREN, J.

WORSWICK, C.J.

---

[7] Moreover, as established in *Armendariz*, "no-contact orders imposed under RCW 9.94A.505(8) may be made effective for a period up to the statutory maximum for the defendant's crime." 160 Wn.2d at 120. Here, first degree abandonment of a dependent person is a class B felony carrying a maximum term of 10 years. RCW 9A.42.060(3); RCW 9A.20.021(1)(b). Accordingly, the provision at issue here necessarily expires after 10 years.