[No. 26241-6-I.   Division One.   August 17, 1992.]

THE STATE OF WASHINGTON, *Respondent*, v. JORGE
LLAMAS-VILLA, *Appellant*.

*Dawn Monroe* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *John L. Belatti, Deputy,* for respondent.

WEBSTER, A.C.J. — Jorge Llamas-Villa (Llamas) appeals his conviction of one count of possession of cocaine with intent to deliver. He asserts that the trial court erred by denying his motion to suppress evidence seized during the execution of a search warrant, and by ordering, as a condition of community placement, that he not associate with persons using, possessing, or dealing with controlled substances. He also asserts that he was denied effective assistance of counsel.

## FACTS

On January 7, 1990, at 12:45 a.m., four officers executed a search warrant at Llamas's apartment. The search warrant authorized the search of "[t]he apartment located at 3301 NE 123rd # 101, in the City of Seattle" and the seizure of:

> Cocaine, items used to weigh, package and prepare narcotics for use or sale, records of customers and records of sales indicative of narcotics trafficking, narcotics paraphernalia, US Currency as the proceeds of narcotics trafficking, papers of dominion and control over the residence, and firearms used to protect the narcotics and money from robbery or police intervention.

The officers knocked and announced they had a warrant. After receiving no response, they "rammed" the door. When they entered Llamas's apartment, he was getting up from the center of the living room floor where he had been sleeping. Detective J.D. Nicholson had no knowledge as to whether Llamas would be armed with a gun. Nevertheless, Nicholson "took him down to the ground" in case he had weapons on his person. Once Llamas was on the floor, officers positioned him face down and handcuffed him with his hands behind his back. According to Sergeant Ed Caalim, this handcuffing procedure was done for safety purposes. Caalim could not recall whether he had reason to believe that anyone in the apartment might have been armed and dangerous. However, he stated that firearms are commonly present when narcotics search warrants are executed. Nicholson testified that he searched Llamas and found some money and a set of keys.[1] Concerning the search of Llamas's person, Nicholson testified:

> On every warrant we tend to empty the pockets. We don't reach in the pocket, because often times people will have needles and things like that, so we tend to turn the pockets out and let whatever is there fall out as opposed to reaching in blindly.

---

[1] When the prosecutor asked Nicholson what he felt when he patted down Llamas, Nicholson answered "Well, there were numerous keys on a ring." The prosecutor then asked him what was on his mind at the time and he replied, "I didn't know what it was."

After searching Llamas, Nicholson searched the kitchen. Finding nothing, he left the apartment through the front door. Once outside, he noticed a door marked "storage" immediately to his right. The door was located a couple of feet from the front door of Llamas's apartment. Nicholson opened the door and entered a room containing several lockers, some of which had locks on them. One of the lockers was labeled "101" and was padlocked. Nicholson believed that the locker was a storage locker for apartment 101. He returned to Llamas's apartment to get the ring of keys found on Llamas and began trying each key in the padlock. One of the keys opened the padlock and Nicholson looked in the locker. He found an open paper sack containing cocaine, heroin, a .22 Ruger handgun and approximately $3,200 in cash.

Robert Jarvis, the manager of the apartment complex, testified that part of the rental fee for each unit included use of a storage locker located in the apartment complex. He also testified that Llamas became a tenant of apartment 101 in November of 1989 and was a tenant when officers searched his apartment. Jarvis stated that the door to the room containing the storage lockers was supposed to be locked, but that "the doors don't shut up all the way."

Following execution of the search warrant, Llamas was charged by information with one count of possession of cocaine with intent to manufacture or deliver, in violation of RCW 69.50.401(a). Llamas moved to suppress evidence seized during the search of the padlocked locker located in the storage room next to his apartment. The trial court denied Llamas's motion. Finding that the relevant facts were undisputed, the trial court reasoned that (1) the detective objectively and reasonably believed locker 101 belonged to the apartment, (2) the storage locker was functionally equivalent to an attic or basement, (3) the search warrant did not exclude a storage locker, (4) the locker was in close proximity to the apartment, and (5) there was no indication that the magistrate would not have included the locker had the police been aware of the floor plan of the apartment building.

A jury convicted Llamas as charged and he received a sentence in the standard range. Llamas was also sentenced to a 1-year term of community placement. One of the conditions of community placement was that Llamas not associate with persons using, possessing, or dealing with controlled substances.

## DISCUSSION

Llamas asserts that Detective Nicholson exceeded the scope of the search warrant in violation of his Fourth Amendment rights when he searched the locker located in the storage room next to Llamas's apartment. The Fourth Amendment prohibits the issuance of any warrant except one " 'particularly describing the place to be searched and the persons or things to be seized.' " *Maryland v. Garrison*, 480 U.S. 79, 84, 94 L. Ed. 2d 72, 107 S. Ct. 1013 (1987). The Washington Constitution contains a similar requirement. *State v. Myrick*, 102 Wn.2d 506, 510, 688 P.2d 151 (1984).

One Washington case involves facts similar to those at issue here. *State v. Kelley*, 52 Wn. App. 581, 762 P.2d 20 (1988). In *Kelley*, the search warrant authorized officers to search the defendant's " 'one story, wood framed residence, green in color, with an attached carport bearing the specific address of . . .' ". *Kelley*, at 584 (quoting the warrant). In executing the search warrant, the officers searched a barn and a garage not included in the warrant. The court upheld suppression of the evidence found in the barn and garage because the warrant did not refer to the outbuildings and they were not incorporated by reference to the affidavit supporting the warrant, which did mention them. *Kelley*, at 586.

In the instant case, the locker that came with the apartment was not mentioned in the affidavit supporting the search warrant, which would have supported an inference that the locker was intentionally excluded from the warrant. As noted by the trial court, there was no indication that the storage locker would not have been included in the warrant had the police known the layout of the apartment

building. Furthermore, unlike the barn and garage in *Kelley*, neither the locker nor the storage room comprised a separate building. The case at bar is therefore distinguishable from *Kelley*.

A federal case, *United States v. Principe*, 499 F.2d 1135 (1st Cir. 1974), also involves similar facts. The warrant in *Principe* authorized search of the premises " 'known as a three-story, woodframe building, at 63 Princeton Avenue, Providence, Rhode Island, the second-floor apartment, in the southwest corner of said building' ". *Principe*, at 1137 (quoting the warrant). In executing the warrant, police searched a cabinet located 3 to 6 feet away from the entrance to the apartment. The court concluded that the cabinet was not an additional or different place, and that "the officers could reasonably suppose, given the second floor layout and its proximity to the apartment, that the cabinet was appurtenant to the apartment, as in fact it was." *Principe*, at 1137.

■ Here, the locker to Llamas's apartment was located inside a storage room a few feet away from the entrance to Llamas's apartment. Unlike the cabinet, the locker was not in plain view. However, the door labeled "storage" was in plain view. Since it was located only a couple of feet away from Llamas's apartment, it was reasonable for police to believe that the storage room either belonged to Llamas's apartment or contained a locker belonging to his apartment. Moreover, upon entering the storage room, it was reasonable for police to assume that the locker labeled "101" belonged to Llamas's apartment "as in fact it [did]". *Principe*, at 1137. *See also United States v. Canestri*, 518 F.2d 269 (2d Cir. 1975) (court held that a locked basement storage room in the house was part of the house).

Based on the above cases, we conclude that the storage locker labeled "101" was not a place different or separate from Llamas's apartment, and that the search of the storage locker fell within the scope of the warrant to search Llamas's apartment. We point out, however, that the authority of the police to search lockers located in the storage room

was strictly limited to the locker appurtenant to Llamas's apartment.[2]

■ We next address whether Llamas was denied effective assistance of counsel because his counsel failed to move to suppress the keys found on his person. A criminal defendant has received ineffective assistance of counsel if counsel's performance fell below an objective standard of reasonableness and a reasonable probability exists that the result of the proceeding would have been different had counsel not performed deficiently. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

■ Here, since the search warrant authorized search of the locker, the items found in the locker were admissible even if the search of Llamas's person and seizure of the keys was illegal. Furthermore, places which may be searched pursuant to a search warrant are not excluded due to the presence of locks or because some additional act of entry or opening may be required. 2 W. LaFave, *Search and Seizure* § 4.10(a), at 313 (2d ed. 1987). Since the police officer could have broken into the locker, if necessary, seizing the keys was not a prerequisite to searching and seizing the items contained in the locker. There is no probability that suppression of the keys would have affected the outcome of the case. Therefore, Llamas was not denied effective assistance of counsel.

Lastly, Llamas asserts that the condition of community placement that he not associate with persons using, possessing, or dealing with controlled substances is vague or overbroad. He contends that although he did not object to this condition below, his claimed error is one of constitutional magnitude and may be raised for the first time on appeal.

---

[2]We reject defense counsel's request to submit a supplemental brief to address the factors set forth in *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986).

*See* RAP 2.5(a); *State v. Scott*, 110 Wn.2d 682, 757 P.2d 492 (1988). "A law is overbroad if it sweeps within its prohibitions constitutionally protected . . . activities." *Seattle v. Huff*, 111 Wn.2d 923, 925, 767 P.2d 572 (1989). A legislative enactment is vague if it does not satisfy "the two requirements of procedural due process . . .: adequate notice to citizens and adequate standards to prevent arbitrary enforcement." *Huff*, at 929; *accord, American Dog Owners Ass'n v. Yakima*, 113 Wn.2d 213, 215, 777 P.2d 1046 (1989).

The issue of whether a condition of community placement can be unconstitutionally overbroad or vague has not been addressed in Washington. Traditionally the overbreadth and vagueness doctrines have been applied to legislative enactments. *E.g., Huff*, at 928-30. In California, courts have recognized the applicability of these doctrines in challenging probation conditions. *E.g., People v. Pointer*, 151 Cal. App. 3d 1128, 1139 n.10, 199 Cal. Rptr. 357, 364 (1984). A potentially overbroad or vague community placement condition involves considerations different from a potentially overbroad or vague legislative enactment. A 1-year term of community placement is a mandatory portion of a criminal defendant's sentence. *See* RCW 9.94A.120(8)(a). A criminal defendant's constitutional rights during community placement are subject to the infringements authorized by the Sentencing Reform Act of 1981 (RCW 9.94A). Along with other mandatory conditions of the 1-year term of community placement, the court may order any of the special conditions set forth in RCW 9.94A.120(8)(c), including that "[t]he offender . . . not have direct or indirect contact with the victim of the crime or a specified class of individuals". RCW 9.94A.120(8)(c)(ii).

■ Llamas asserts that the condition is invalid because it is not narrowly drawn. He asserts that the condition would achieve the purposes for which it was imposed if it were limited to individuals whom Llamas *knows* to use, possess, or deal with controlled substances. RCW 9.94A.120(8)(c)(ii) does not limit the prohibited contact with a specified class of individuals to those whom the criminal offender knows belong to the class. If Llamas is arrested for violating the

condition, he will have an opportunity to assert that he was not aware that the individuals with whom he had associated were using, possessing, or dealing drugs. *See* RCW 9.94A-.205. We hold that the condition imposed provides adequate notice of what conduct is prohibited and is neither overbroad nor vague.

■ We also reject Llamas's assertion that the condition is invalid because it is not crime related. There is no statutory requirement that a special community placement condition imposed under RCW 9.94A.120(8)(c) be crime related. Even if crime relatedness were required, we hold that the condition restricting Llamas's association with persons using, possessing, or dealing with controlled substances *is* crime related. A condition is crime related if it directly relates to the circumstances of the crime. RCW 9.94A.030(11). No causal link need be established between the condition imposed and the crime committed, so long as the condition relates to the circumstances of the crime. *See State v. Parramore*, 53 Wn. App. 527, 768 P.2d 530 (1989) (community supervision condition requiring defendant convicted of selling marijuana to submit to urinalysis was directly related to his drug conviction despite absence of evidence on whether defendant smoked marijuana).[3] Since associating with individuals who use, possess, or deal with controlled substances is conduct intrinsic to the crime for which Llamas was convicted, it is directly related to the circumstances of the crime.

The judgment is affirmed.

BAKER and AGID, JJ., concur.

---

[3]Although the *Parramore* case involved "community supervision" as opposed to "community placement", the case law governing what constitutes a "crime-related prohibition" has applications in both contexts. *Compare* RCW 9.94A-.120(5)-(7) (community supervision) *with* RCW 9.94A.120(8)(c)(vi) (community placement).