

FILED
COURT OF APPEALS
STATE OF WASHINGTON

2013 JUL 29 PM 12: 39

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70349-8-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL SHANNON DEROUEN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: July 29, 2013 |
| | ) | |

VERELLEN, J. — Michael Derouen appeals his convictions for four counts of rape of a child in the third degree. The State presented evidence that Derouen had engaged in sexual intercourse with victim B.D. when she was between 14 and 15 years old. Derouen contends the trial court erred in admitting evidence of prior sexual misconduct under RCW 10.58.090 and ER 404(b). The State concedes our Supreme Court has since declared RCW 10.58.090 unconstitutional. Only some of the evidence was admissible under ER 404(b), and the trial court failed to give a proper limiting instruction to accompany it. However, both the inadmissible ER 404(b) testimony and the instructional error were harmless, given the strength of the State's evidence.

Finally, Derouen contends, and the State concedes, that the court erred in imposing a sentence that exceeded the statutory maximum. We affirm Derouen's convictions, but remand for resentencing in accordance with RCW 9.94A.701(9). At

resentencing, we direct the trial court to reconsider the scope and duration of the no-contact orders prohibiting Derouen from interacting with his sons and male minors.

## FACTS

In early 2004, Michael Derouen hired 14-year-old neighbor B.D. to babysit his three sons.[1] She started babysitting the children about once a week. B.D. testified that Derouen was friendly to her, asking about her life. He constantly asked who B.D. was dating and steered the conversation toward sex and romance, and, eventually, directly flirted with her. He then started having B.D. over more regularly, including Fridays and weekends, and began to kiss her and touch her. B.D. testified that Derouen "made me feel really good about it [sexual contact]. I thought somebody cared about me and was interested in me."[2] She further testified Derouen told her he loved her and that they would get married "as soon as I turned 18."[3] He would give her "little trinkets" all the time, and would give her gifts for Valentine's Day, Christmas, and her birthday.[4]

B.D. testified that they first had sexual intercourse on June 27, 2004, after having oral sex a few times. By the summer of 2004, B.D. and Derouen were engaging in frequent oral sex and intercourse. B.D. ended the relationship in December 2005 or January 2006 and told her parents about it. B.D.'s father reported Derouen to Child Protective Services.

---

[1] At the time, Derouen was married to Catherine Merritt, who went by the name "Cassie." Cassie moved out of the Derouen house in the spring of 2006.

[2] Report of Proceedings (RP) (July 25, 2011) at 346.

[3] Id. at 365.

[4] Id. at 366.

*ER 404(b) Evidence Regarding J.S. and D.L.*

Before trial, the court heard argument on the admissibility under ER 404(b) and RCW 10.58.090 of the testimony of J.S. and D.L., two other young women with whom Derouen allegedly had sexual relationships. The court concluded the testimony of J.S. was admissible under ER 404(b) and the testimony of D.L. was admissible under both RCW 10.58.090 and ER 404(b).

a. <u>J.S. Testimony</u>

J.S. met Derouen at a Veterans of Foreign Wars (VFW) convention in the summer of 2002. She was 15 years old at the time. The two saw each other again at another VFW convention in January of 2003. During these conventions, they became friendly and talked to each other somewhat frequently. In January of 2004, at another VFW convention, J.S. got into a fight with her stepmother and went to Derouen's hotel room to talk. They began talking, which eventually led to kissing and sexual intercourse. J.S. testified that she had sex with Derouen voluntarily.

After their one sexual encounter at the VFW convention, J.S. and Derouen ceased to have a sexual relationship. When J.S. turned 18, she moved out of her parents' house, and shortly thereafter moved in with the Derouens. She began taking care of his children and cleaning the house in exchange for rent, and soon developed a close relationship with Cassie.

b. <u>D.L. Testimony</u>

Derouen and D.L. met in September of 2004, when D.L. was 13 years old.[5] She was walking past the Derouen home and noticed they were giving away a glass

---

[5] D.L.'s date of birth is October 24, 1990.

terrarium. She knocked on their door to ask whether she could take it, and then Derouen offered to show D.L. his reptile collection. D.L. returned to visit because she liked Derouen's kids and thought it was a fun environment. Over the next few months, D.L. began spending more and more time at the Derouen house, about two to three times a week, and would occasionally spend the night in the room where J.S. also stayed. She went on vacations with the family. At some point between the fall of 2004 and the spring of 2005, Derouen kissed D.L. while she was pretending to sleep. D.L. continued to spend time with the Derouens through 2006, when Cassie moved out. D.L. spent Christmas with the family and received gifts.

Soon after Cassie moved out in spring of 2006, Derouen told D.L. that he was in love with her. D.L. was stunned, and said that she loved Derouen too. She was 15 years old at this point. Over the next few months, Derouen began touching her on her breasts and vagina, and they eventually had sexual intercourse. Derouen told D.L. that he was sacrificing his freedom to be with her, which made D.L. feel that "[i]t was a burden, but at the same time it made me feel that I was important."[6] Derouen told D.L. that she was really sexy, and that she "needed to show that [she] loved him; otherwise, he would not be okay, and he could kill himself or something."[7] Derouen told D.L. that they would get married when she turned 18. Derouen testified that D.L. eventually moved into the Derouen home and lived there from August 2007 until April 2008. Eventually, D.L. began feeling bad about the relationship and ceased spending time at the Derouen home.

---

[6] RP (July 21, 2011) at 154.

[7] Id.

4

D.L. then reported the relationship to the police. Police worked with D.L. to record a phone conversation between her and Derouen, in which he admitted having sex with her:

D.L:  So, um having sex with me did bother you--I mean having a wife and having sex [with] me didn't bother you?

DEROUEN:  Yeah it did.[8]

Derouen testified at trial and admitted that he had sex with J.S. during the VFW convention, but said it was consensual and happened when J.S. was 17. He denied having any sexual contact with B.D. or D.L. Other witnesses testified they had not observed any alarming behavior between B.D. and Derouen, or any other young women.

The State charged Derouen with four counts of rape of a child in the third degree, pursuant to RCW 9A.44.079[9] for incidents with B.D. between June 2004 and March 2005. The jury convicted Derouen of all four counts. The court sentenced him to 60 months of confinement, equal to the statutory maximum. The court also imposed 36 months of community custody, noting "[t]otal confinement, to include incarceration and community custody combined[,] shall not exceed 60 month statutory maximum."[10] Finally, the court entered a no-contact order, preventing Derouen from having contact

---

[8] Clerk's Papers at 95.

[9] "A person is guilty of rape of a child in the third degree when the person has sexual intercourse with another who is at least fourteen years old but less than sixteen years old and not married to the perpetrator and the perpetrator is at least forty-eight months older than the victim." RCW 9A.44.079(1).

[10] Clerk's Papers at 216.

"with minors <u>except for</u> defendant's sons, so long as the sons request the contact."[11]

Derouen timely appealed.

## DISCUSSION

### *ER 404(b) Opinion Testimony*

Derouen asserts the trial court erred in admitting J.S. and D.L.'s testimony. The State sought admission of the testimony under the common scheme or plan exception to ER 404(b)'s prohibition of propensity evidence. ER 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

As the court in <u>State v. Lough</u> explained, "[A] common plan or scheme may be established by evidence that the Defendant committed markedly similar acts of misconduct against similar victims under similar circumstances."[12] Or, stated slightly differently, this "plan" exception arises "when an individual devises a plan and uses it repeatedly to perpetrate separate but very similar crimes."[13] The degree of similarity between the prior bad acts and the charged crimes "must be substantial."[14]

Assuming such a common plan or scheme is evident, the prior bad acts are admissible if they are (1) proved by a preponderance of the evidence, (2) admitted for

---

[11] Clerk's Papers at 216.

[12] 125 Wn.2d 847, 853, 889 P.2d 487 (1995). The other situation in which the "plan" exception might arise is where "several crimes constitute constituent parts of a plan in which each crime is but a piece of the larger plan. There is no question that evidence of a prior crime or act would be admissible in such a case to prove the doing of the crime charged." <u>Lough</u>, 125 Wn.2d at 854-55.

[13] <u>Id.</u> at 855.

[14] <u>State v. DeVincentis</u>, 150 Wn.2d 11, 20, 74 P.3d 119 (2003).

the purpose of proving a common plan or scheme, (3) relevant to prove an element of the crime charged or to rebut a defense, and (4) more probative than prejudicial.[15] The party offering the evidence of prior misconduct has the burden of proving by a preponderance of the evidence that the misconduct actually occurred.[16]

We review the correct interpretation of an evidentiary rule de novo, as a question of law.[17] Once the rule is correctly interpreted, we review the trial court's decision to admit or exclude evidence for an abuse of discretion.[18] A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons.[19] We may consider other proper bases on which to affirm the trial court's admission of evidence.[20]

The court made the following determination on the record:[21]

> When you go through those prongs it is clear to me that he was grooming her, or grooming these young women, and that there are enough similarities among all three of them to show that he had a motive, intent, and plan. They are so similar and consistent, you know, when you look at the proximate age in which he started the grooming process . . . when you look at all of them were babysitters or had some prior contact with him . . . the approaches that were taken seemingly are very, very similar. The whole situation of, you know, the overtures of both physical and verbal are very, very similar.

---

[15] Lough, 125 Wn.2d at 852.

[16] Id. at 853.

[17] See State v. Walker, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998).

[18] Lough, 125 Wn.2d at 861.

[19] State v. Berg, 147 Wn. App. 932, 942, 198 P.3d 529 (2008).

[20] State v. Powell, 126 Wn.2d 244, 259, 893 P.2d (1995).

[21] Where the prior bad acts are sexual in nature, and the defendant has not been convicted based on those past acts, the trial court retains the discretion to hold an evidentiary hearing or rely on an offer of proof. State v. Kilgore, 147 Wn.2d 288, 294-95, 53 P.3d 974 (2002). Here, the trial court accepted the offer of proof regarding D.L.'s testimony but ordered an evidentiary hearing regarding J.S.'s testimony.

. . . .

> And also when you look at the time frame, that is pretty close in time too. . . . If you look at the sequence of events of all of them, he was married on and off. . . . All of them; DL, BD, and JS were all groomed while they were babysitting for his kids and at his family residence . . . . You know, he starts of grooming them in the sense of kissing them or touching them in very similar ways.

> . . . .

> For the reason I stated before, then you look at the frequency of the prior acts, and whenever they babysit or stayed overnight he would still approach them while his wife . . . was still at the home. He would . . . [say] he loved them and couldn't live without them. And so all of those overtures were the same. . . .

> And then when you get into the probative value outweighing the prejudicial effect, . . . I believe that the prongs have been met under 404(b).[22]

a. D.L.'s Testimony

Derouen challenges the court's determination that his relationship with D.L. was more probative than prejudicial.[23] The probative versus prejudicial balancing in this context involves consideration of three factors: (1) the "highly probative" nature of common scheme or plan evidence "because it tend[s] to show that the defendant had followed the same design or plan on a number of occasions"; (2) the need for the evidence; and (3) the presence of a limiting instruction.[24]

D.L.'s testimony was highly probative because it showed Derouen's execution of the same plan to groom both D.L. and B.D. by inviting them into his household to take

---

[22] RP (July 13, 2011) at 21-23.

[23] He does not contest the trial court's determination regarding common scheme or plan.

[24] State v. Krause, 82 Wn. App. 688, 696-97, 919 P.2d 123 (1996) (citing Lough, 125 Wn.2d at 864)).

8

care of his sons, beginning to flirt and touch them slowly, promising to marry them, giving them gifts, and eventually engaging in sex. As the State points out, Derouen pleaded not guilty, putting every element at issue, heightening the State's need for the evidence. Although the accompanying ER 404(b) limiting instruction was flawed, as we discuss below, the trial court did not abuse its discretion in determining D.L.'s testimony was more probative than prejudicial.

b. J.S.'s Testimony

Derouen challenges the court's determination that his relationship with J.S. demonstrated a common scheme or plan. Unlike the extensive grooming process that Derouen conducted with D.L. and B.D., Derouen had significantly less interaction with J.S. before they engaged in sexual intercourse. Their interactions were mostly in public, at the VFW conventions. J.S. was never in Derouen's home before they had sexual intercourse, nor did he tell her that he loved her or wanted to marry her. Further, the timing and progression of the relationships was different. Unlike with D.L. and B.D., whom Derouen invited into his household long before engaging in sexual intercourse, all the sexual contact with J.S. began and ended in one night.

There is not a "substantial" similarity between Derouen's relationship with J.S. and victim B.D.[25] The trial court abused its discretion in determining J.S.'s testimony was admissible under the common scheme or plan exception to ER 404(b).

c. Instructional Error

Finally, Derouen contends the court gave an improper ER 404(b) limiting instruction. If the trial court admits evidence of a defendant's prior bad acts, the

---

[25] See DeVincentis, 150 Wn.2d at 20.

9

defendant is entitled to a limiting instruction upon request.[26] Once a defendant requests

the limiting instruction, "the trial court has a duty to correctly instruct the jury,

notwithstanding defense counsel's failure to propose a correct instruction."[27] An

ER 404(b) limiting instruction must, "at a minimum, inform the jury of the purpose for

which the evidence is admitted and that the evidence may not be used for the purpose

of concluding that the defendant has a particular character and has acted in conformity

with that character."[28] If the court fails to give a proper limiting instruction, we consider

whether the error may be harmless.[29] The error is harmless "unless, within reasonable

probabilities, had the error not occurred, the outcome of the trial would have been

materially affected."[30]

Derouen did not initially request the limiting instruction, but Derouen's counsel,

the prosecutor and the court discussed an instruction and agreed on language. The

instruction given read:

> Evidence has been admitted in this case regarding the defendant's
> commission of a previous sex act or offense. The defendant is not on trial
> for any act, conduct, or offense not charged in this case.
>
> Evidence of [a] prior sex act or offense on its own is not sufficient to
> prove the defendant guilty of the crimes charged in this case. The State

---

[26] State v. Gresham, 173 Wn.2d 405, 423, 269 P.3d 207 (2012). However, the trial court has no duty to give the limiting instruction sua sponte. Id. at 423 n.2.

[27] Id. at 424-25 ("This approach is also more efficient and better prevents the possibility of unfair prejudice than does the alternative of holding that defense counsel's failure to craft a proper instruction is waiver of the request for a limiting instruction, thereby relegating the defendant to a personal restraint petition alleging ineffective assistance of counsel.").

[28] Id. at 423-24.

[29] Id. at 425.

[30] Id. (internal quotation marks omitted) (quoting State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

has the burden of proving beyond a reasonable doubt that the defendant committed each of the elements of the crimes charged.[31]

This instruction neither informed the jury of the purpose for which the ER 404(b) evidence was admitted, nor stated that "the evidence may not be used for the purpose of concluding that the defendant has a particular character and has acted in conformity with that character," as required under Gresham.[32]

### d. Harmless Error

Both the admission of J.S.'s testimony and the instructional error were harmless. First, the State presented the victim's detailed testimony of Derouen's sex acts with her, which by itself could have been sufficient to convict Derouen.[33]

Second, B.D. was 14 and 15 during her relationship with Derouen, her trial testimony was internally consistent, and no witnesses called into doubt her ability to accurately remember the events, as is sometimes a concern with younger victims.

Third, B.D.'s testimony at trial was also consistent with her reports to her father, her fiancé, and Detective Quilio. Both her father and her fiancé testified that B.D. told them she had a sexual relationship with Derouen when she was 14 and 15. Detective Quilio recounted what B.D. had told her in more detail:

Q.  During the interview did she tell you what had happened to her?

. . . .

A.  [B.D] related to me a relationship that had occurred in her life several years prior with a neighbor who was quite a bit older than her. . . .

---

[31] Clerk's Papers at 187.

[32] Gresham, 173 Wn.2d at 423-24.

[33] See id. at 425 (applying harmless error test).

Q.  How old did she say that she was when she began a relationship with the older man?

A.  She initially encountered him and began developing a friendship at 14, and it turned sexual at 15.

Q.  Did she provide you with any details about how the relationship progressed?

A.  Yes, she did.  She actually had quite a few details on the nature of the relationship and the progression of sexual activity.

Q.  What did she say about how it began and then how it progressed?

A.  . . . It began with conversations and getting to know one another, and then those conversations turned to a bit more intimacy, and then there is hugging and touching, and then that progresses to more intimate touching, and then to sexual contact.

Q.  Did she express to you or did she say to you that this older man had told her that he was in love with her despite their age difference?

A.  Yes, he did.  That's what she told me he said.  Yes.

Q.  Did she actually describe for you . . . instances of sexual contact, sexual intercourse between the two of them?

A.  Yes, she did.  She described both sexual contact as well as sexual intercourse. . . . She described fairly, what you would consider, normal, routine sexual activities between two people, but she was 15 at the time.[34]

Fourth, both Derouen and B.D. testified at trial, and the jury had the opportunity to assess their credibility.

Fifth, although the prosecutor discussed the ER 404(b) evidence in closing, she also stated:

What it's [D.L.'s and J.S.'s testimony] intended to do is provide you with context.  It is evidence of a common scheme[;] that the defendant has a method that he developed and perfected to seduce teenage girls . . . as

---

[34] RP (July 26, 2011) at 475-77.

teens generally but [who were] also somewhat vulnerable or susceptible given their situations.[35]

In rebuttal, the prosecutor again emphasized that the State's use of D.L.'s testimony was to show the similarity with which Derouen treated both young women. The prosecutor did not urge an improper use of the common plan evidence.

Finally, the instruction given, although incorrect, emphasized that the ER 404(b) evidence was not to be given conclusive weight.[36] The instruction did not include the problematic direction that evidence of the defendant's commission of another sex offense "may be considered for its bearing on any matter to which it is relevant."[37] Such language would have expressly permitted jurors to use evidence of Derouen's prior misconduct as propensity evidence.

We conclude the improper admission of J.S.'s testimony and the lack of a proper ER 404(b) limiting instruction were harmless because we see no reasonable probability that the outcome would have been different.

---

[35] RP (July 27, 2011) at 686-87.

[36] The instruction read, "Evidence has been admitted in this case regarding defendant's commission of a previous sex act or offense. The defendant is not on trial for any act, conduct, or offense not charged in this case. Evidence of prior sex act or offense on its own is not sufficient to prove the defendant guilty of the crimes charged in this case. The State has the burden of proving beyond a reasonable doubt that the defendant committed each of the elements of the crime charged. Clerk's Papers at 187.

[37] See, e.g., State v. Scherner, 153 Wn. App. 621, 639, 225 P.3d 248 (2009), affirmed by Gresham, 173 Wn.2d at 425 (holding instructional error was harmless in Scherner's case, due to "overwhelming evidence of Scherner's guilt").

*RCW 10.58.090*

Derouen contends, and the State concedes, that the trial court erred in admitting pursuant to RCW 10.58.090[38] D.L.'s testimony about the sexual acts between him and D.L.[39] Our Supreme Court held in State v. Gresham that RCW 10.58.090 is unconstitutional because it "irreconcilably conflicts with ER 404(b) regarding a procedural matter," and therefore violated the "separation of powers doctrine."[40] In Gresham, the court applied the nonconstitutional harmless error test because it had already determined the disputed evidence was not admissible under ER 404(b).[41] But here, because the trial court properly admitted the entirety of D.L.'s testimony under ER 404(b), the error under RCW 10.58.090 is necessarily harmless.

*Sentencing Error*

Derouen challenges the propriety of his sentence, arguing he was sentenced for more than the statutory maximum, and the State concedes error. A court may not impose a term of confinement and community custody which "exceeds the statutory maximum for the crime."[42] The statutory maximum for third degree rape of a child is five

---

[38] The statute provided, "In a criminal action in which the defendant is accused of a sex offense, evidence of the defendant's commission of another sex offense or sex offenses is admissible, notwithstanding Evidence Rule 404(b), if the evidence is not inadmissible pursuant to Evidence Rule 403." RCW 10.58.090(1).

[39] The trial court's ruling on this is somewhat unclear. It appears the court may have admitted under RCW 10.58.090 D.L.'s testimony about sexual contact before D.L. turned 16, and admitted under ER 404(b) D.L.'s testimony about sexual contact after she turned 16.

[40] 173 Wn.2d 405, 432, 269 P.3d 207 (2012).

[41] Id. at 432-33.

[42] RCW 9.94A.505(5); State v. Zavala-Reynoso, 127 Wn. App. 119, 124, 110 P.3d 827 (2005).

years,[43] and the trial court sentenced Derouen to five years of confinement and 36 months of community custody. Even though the court noted that "[t]otal confinement, to include incarceration and community custody combined[,] shall not exceed 60 month statutory maximum,"[44] the court was required to comply with RCW 9.94A.701(9). That subsection provides that "[t]he term of community custody . . . shall be reduced by the court whenever an offender's standard range term of confinement in combination with the term of community custody exceeds the statutory maximum for the crime as provided in RCW 9A.20.021."[45] We must therefore remand for resentencing.

Derouen also raises significant concerns regarding the limitations imposed on his contact with his sons and male minors. At resentencing, we direct the court to reconsider the scope and duration of the no-contact orders with respect to Derouen's sons and male minors. RCW 9.94A.505(9) provides that "[a]s a part of any sentence, the court may impose and enforce crime-related prohibitions and affirmative conditions as provided in this chapter." "'Crime-related prohibition' means an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted."[46] Although the conduct prohibited during community custody must be directly related to the crime, it need not be causally related to the crime.[47]

---

[43] RCW 9A.20.021(c); RCW 9A.44.079(2).

[44] Clerk's Papers at 216.

[45] RCW 9.94A.701(9); see also State v. Boyd, 174 Wn.2d 470, 472-73, 275 P.3d 321 (2012) (for defendants sentenced after RCW 9.94A.701(9) became effective on July 26, 2009, the trial court, rather than the Department of Corrections, is required to adjust community custody to avoid a sentence in excess of the statutory maximum). Derouen was sentenced in November 2011.

[46] RCW 9.94A.030(10).

[47] State v. Llamas-Villa, 67 Wn.App. 448, 456, 836 P.2d 239 (1992).

In addition to ordering that Derouen have no contact with B.D., the court specified that during community custody, Derouen could not have any contact with minors, and could only have contact with his sons if they initiated the contact. The court also ordered in section 4.4 of the judgment and sentence that Derouen have "[n]o contact with minors except for the defendant's sons so long as the sons request the contact."[48] The language of section 4.4 could be interpreted as a lifetime no-contact order.

a. Contact with Sons

A parent has a constitutionally protected fundamental right to raise children without State interference.[49] However, in criminal cases, a court may impose limitations on this right if they are reasonably necessary to further the State's compelling interest in protecting children.[50] Sentencing conditions that affect the fundamental right to parent must be "sensitively imposed."[51] According to record before us,[52] the presentence report writer did not believe there was any issue with Derouen having contact with his sons.[53] The State did not request such a prohibition. Derouen advocated vigorously to the court that he wanted to be a positive figure in his sons' lives. The letters in support of Derouen also consistently spoke to the need for him to remain involved in his sons' lives. There is nothing in the record before us suggesting that Derouen's sons have

---

[48] Clerk's Papers at 216.

[49] State v. Letourneau, 100 Wn. App. 424, 438, 997 P.2d 436 (2000).

[50] Id. at 439-42.

[51] State v. Warren, 165 Wn.2d 17, 32, 195 P.3d 940 (2008).

[52] The parties did not designate the presentence reports for inclusion in the clerk's papers.

[53] See RP (Nov. 10, 2011) at 740.

been negatively impacted or traumatized by his conduct. The trial court's prohibition appears to bear no relationship to the crime and may interfere with Derouen's fundamental right to raise his children.[54]

### b. Contact with Male Minors

The presentence report writer did not believe there was any issue with Derouen having contact with male minors.[55] At resentencing, we direct the trial court to consider whether Derouen should be allowed to have contact with male minors.[56]

*Statement of Additional Grounds*

In his statement of additional grounds, Derouen challenges the sufficiency of the evidence in count 1 and count 2. Derouen's arguments amount to an attack on the victim's credibility, but we do not disturb credibility determinations on appeal.[57] Derouen also contends the prosecutor improperly amended the information to add counts 3 and 4 without introducing new evidence. The declaration for determination of probable cause stated Derouen and B.D. had sex one to two times per week from the time B.D. was 15 until she was approximately 17, which spans the time frame alleged in counts 3

---

[54] See, e.g., In re Pers. Restraint of Rainey, 168 Wn.2d 367, 381-82, 229 P.3d 686 (2010) (striking a lifetime no-contact order prohibiting a father from contact with his child and remanding for resentencing because the sentencing court did not articulate any reasonable necessity for the lifetime duration).

[55] See RP (Nov. 10, 2011) at 740 ("the presentence report writer did not believe there is an issue with respect to Mr. Derouen having contact with not just his sons but any minor male children").

[56] Under Boyd, 174 Wn.2d at 473, the trial court may either correct the judgment and sentence or resentence the defendant consistent with RCW 9.94A.701(9). Although we remand for resentencing to allow the trial court to address Derouen's concerns with the scope and duration of the no-contact orders, we leave it to the discretion of the trial court to either strike the community custody term or conduct a resentencing with respect to some combination of confinement and community custody within the statutory maximum.

[57] State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

and 4.[58] Finally, Derouen contends he was sentenced based on an incorrect offender score. Derouen stipulated to his offender score, so we decline to address this argument on appeal.[59]

We affirm Derouen's convictions and remand for resentencing.

WE CONCUR:

---

[58] In April 2011, the State filed an amended information alleging two more counts of rape of a child in the third degree, with the time frames for the third and fourth count being between June 28, 2004 and October 31, 2004 and between November 1, 2004 and March 26, 2005, respectively.

[59] State v. Ross, 152 Wn.2d 220, 231, 95 P.3d 1225 (2004); see also In re Pers. Restraint of Goodwin, 146 Wn.2d 861, 873-75, 50 P.3d 618 (2002).