FILED
COURT OF APPEALS
DIVISION II

2013 SEP -4 AM 10: 15

STATE OF WASHINGTON

DEPUTY

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42416-9-II |
| Respondent, | |
| v. | |
| JEREMY WAYNE CARR, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, J. — Jeremy Wayne Carr appeals his two jury convictions for first degree child rape and two sentencing conditions. Carr argues that (1) the trial court erred in admitting child hearsay statements because several *Ryan*[1] factors weighed against reliability, (2) the trial court erred by not allowing Carr to cross-examine witnesses about AB's habit of lying, (3) the State produced insufficient penetration evidence to constitute rape, (4) the sentencing court erred by prohibiting Carr from contact with minors and requiring Carr to submit to polygraph testing, and (5) cumulative error deprived Carr of a fair trial. We hold that (1) substantial evidence supports the trial court's finding of reliability and the child hearsay's admission was proper, (2) Carr failed to preserve for review the issue of witness cross-examination regarding AB's habit of lying, (3) the State presented sufficient penetration evidence to support two rape convictions, (4) the sentencing conditions were proper, and (5) there is no cumulative error. Accordingly, we affirm.

---

[1] *State v. Ryan*, 103 Wn.2d 165, 691 P.2d 197 (1984).

FACTS

In 2008, Carr and KF[2] began dating. Soon, Carr, KF, and her children, EB, LB, and AB, began living together. Carr's brother, Chris,[3] and Carr's son also lived with them at times. Carr and Chris watched the kids while KF worked. By September or October 2009, KF and Carr broke up and Carr moved out. About a month later, Carr returned to the home and stayed a few more days before moving out permanently.

In June or July 2010, eight-year-old AB told KF that one night while KF was at work, Carr came into her room and touched her vagina with two fingers. AB demonstrated to KF how Carr did so by wiggling her fingers back and forth. KF did not know when it had happened but she reported it to the police.

In August 2010, Sasha Mangahas, a Kitsap County child interviewer with the prosecutor's office, interviewed AB. AB told her that one evening while her mother was at work, Carr came into her room, pulled up her skirt and underwear and slid his fingers inside of her "wee wee," which meant her genitalia area. Verbatim Report Proceedings (VRP) (June 9, 2011) at 35. And, AB told Mangahas that Carr left the room but returned several minutes later and touched her the same way a second time and that afterwards AB went to the bathroom and observed a scratch in her genital area.

In January 2011, the State charged Carr with one count of first degree child molestation. The State later amended the charges to two counts of first degree child rape. In May 2011, the

---

[2] We use initials to protect the privacy of sexual assault victims.

[3] For clarity, we refer to Carr's brother by his first name, intending no disrespect.

trial court held a child hearsay or *Ryan*[4] hearing and Mangahas, KF, EB, and AB testified. The trial court determined that AB's pretrial statements were reliable and admissible at trial.

During motions in limine, the State moved to exclude KF and EB's testimony about AB's credibility. The court allowed "reputation evidence of truthfulness." VRP (June 6, 2011) at 11. And, specifically instructed Carr, "[I]f you believe . . . that the State has opened the door [to 404(b)], I ask that you simply take this matter up before you start questioning so you can get a further ruling from the Court." VRP (June 6, 2011) at 11-12. At trial, Carr did not ask KF or EB about AB's credibility nor did Carr ask the trial court to further rule on the issue.

In addition to KF and Mangahas, the State called EB and AB to testify. EB testified that after Carr moved out, AB told him that Carr touched her in her private and that AB was scared to tell EB because she thought that he would not believe her. AB testified that her relationship with Carr was "not so good" and that he was meaner to her than he was to all the other children. VRP (June 9, 2011) at 92. Also, AB testified about the incident and stated that it happened one evening after KF had gone to work. While she was in her room watching a movie, Carr came in, put his hand up her underwear and shorts and touched the inside of her "front private." VRP (June 9, 2011) at 84. He wiggled his fingers inside her front private for about a minute, left the room for a few minutes, and then came back in and did it again. Afterwards, he threatened her and told her not to tell anyone. Carr moved out of their house shortly after this happened but AB waited to tell her mom because she wanted to make sure that Carr was completely out of her life before doing so.

---

[4] *Ryan*, 103 Wn.2d at 165.

Carr did not testify, but presented testimony from Chris, and Becky Durkee, a private defense investigator who also interviewed AB. Durkee testified about her interview with AB and that AB told her about Carr's touching and that it happened twice. During their deliberations, the jury asked for the legal definition of "vagina." The court provided an agreed response to the jury. The jury found Carr guilty of two counts of first degree child rape.

The court imposed a standard range sentence and numerous community placement conditions including restricting Carr from contact with minors and requiring him to submit to polygraph examinations. Carr did not object. Carr timely appeals.

ANALYSIS

I. CHILD HEARSAY

Carr argues that the trial court erred by admitting AB's statements to KF, Mangahas, and EB after the child hearsay hearing pursuant to *State v. Ryan*, 103 Wn.2d 165, 691 P.2d 197 (1984). We disagree.

A. Standard of Review

We review the trial court's decision to admit child hearsay evidence for an abuse of discretion. *State v. Borboa*, 157 Wn.2d 108, 121, 135 P.3d 469 (2006). A trial court abuses its discretion "'only when its decision is manifestly unreasonable or is based on untenable reasons or grounds.'" *Borboa*, 157 Wn.2d at 121 (quoting *State v. C.J.*, 148 Wn.2d 672, 686, 63 P.3d 765 (2003)). We review challenges to findings of fact supporting the admission to determine whether substantial evidence supports each challenged finding, and we review the trial court's conclusions of law de novo to determine whether the findings support the challenged conclusions. *State v. Halstien*, 122 Wn.2d 109, 128-29, 857 P.2d 270 (1993); *State v. Alvarez*,

105 Wn. App. 215, 220, 19 P.3d 485 (2001); *State v. B.J.S.*, 140 Wn. App. 91, 97, 169 P.3d 34 (2007). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the premise's assertion. *Halstien*, 122 Wn.2d at 129. Unchallenged findings of fact are verities on appeal. *State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994).

## B. Discussion

RCW 9A.44.120 authorizes the admission of hearsay statements made by a child under certain circumstances. In a case alleging a defendant had sexual contact with a child, statements by the child describing the contact are admissible if the court holds a hearing outside the jury's presence and finds that the time, content, and circumstances of the statements provide indicia of reliability and the child testifies at the proceeding. RCW 9A.44.120. In *Ryan*, the Supreme Court adopted a set of factors applicable to determining the reliability of hearsay statements. 103 Wn.2d at 175-76. The factors are:

> "(1) [W]hether there is an apparent motive to lie; (2) the general character of the declarant; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; and (5) the timing of the declaration and the relationship between the declarant and the witness[;]" [(6)] the statement contains no express assertion about past fact[; (7)] cross examination could not show the declarant's lack of knowledge[; (8)] the possibility of the declarant's faulty recollection is remote[;] and [(9)] the circumstances surrounding the statement (in that case spontaneous and against interest) are such that there is no reason to suppose the declarant misrepresented defendant's involvement.

*Borboa*, 157 Wn.2d at 121-22 (quoting *Ryan*, 103 Wn.2d at 175-76 (alterations in original)). To be admissible, the statements need only substantially meet these factors. *State v. Woods*, 154 Wn.2d 613, 623-24, 114 P.3d 117 (2005).

Carr challenges findings of fact and conclusions of law relating to four of the *Ryan* factors. After careful review of the record we hold the trial court properly admitted the child hearsay statements after finding the statements reliable under the *Ryan* factors.

1. *Motive To Lie*

Carr challenges finding of fact 19[5] and 20. Finding 19 provides:

> That the Court finds that while [AB] obviously disliked the Defendant when he lived in the house, this dislike has not risen to the level of animosity necessary to create a motive to lie.

CP at 73. Similarly, finding 20 provides:

> That for the Court to find that [AB] had a motive to lie, it would need indications that she thought the Defendant was coming back to the house, that her mom and the Defendant were getting back together, or that there was some type of gain for her, none of which are supported by the evidence here.

CP at 73.

These findings were supported by AB's, EB's, and KF's testimony at the child hearsay hearing.

Although Carr asserts that AB must have had something to gain because she wanted Carr out of the house, AB did not tell KF about the incident until long after Carr had moved out. She specifically testified that she wanted to make sure Carr was completely out of her life before she told KF about what happened. Mangahas testified that AB told her that she waited to tell KF because she did not want to upset her, and KF and EB testified that Carr had already moved out when AB had told them about the incidents. Further, unchallenged finding 25 is a verity on appeal and it supports this finding; it says that there was no evidence that AB was in trouble or

---

[5] The trial court used Roman numerals.

seeking attention when she disclosed to EB and KF what happened. Substantial evidence supports findings 19 and 20.

2. *More than One Person Hearing the Statements*

Carr challenges finding of fact 30 which provides that multiple people heard AB's statement and it was relatively consistent. Although Carr asserts that they were inconsistent, the trial court found that AB's statements were "relatively consistent" and that finding is supported by the testimony from AB, KF, EB, and Mangahas at the child hearsay hearing. Mangahas and KF testified that AB told them that Carr came into her room one night after KF had gone to work and touched the inside of her vagina with his fingers. Mangahas and KF also testified that it happened before Carr had moved out, and that AB waited to tell KF about it until after Carr moved out. AB told Mangahas that she waited to tell KF because she did not want to upset her and EB testified that she asked him not to tell KF because she wanted to do it herself but that she waited a few months to do so. EB also testified that Carr was no longer living with them when AB told him about the touching and that AB said that Carr touched her privates. AB testified to all these things—that Carr came into her room one night after KF left for work and started touching the inside of her privates with his fingers. AB also testified about the timeline, that she waited a long time before telling KF because she wanted Carr to be out of her life before she did so.

Carr argues that AB's statements to Mangahas, KF and EB were inconsistent because (1) AB told only Mangahas that Carr covered her mouth with a teddy bear when she tried to yell and did not tell anyone else about the teddy bear, and (2) AB told Mangahas that she was wearing a skirt at the time but AB testified that she was wearing shorts. The State responded that these

were not important details, especially because KF and EB both testified that AB simply did not give them details when she told them about the touching. The State is correct. Carr does not show how details about a teddy bear or what AB was wearing make AB's stories inconsistent. Thus, the trial court did not abuse its discretion in determining that AB's stories were relatively consistent. Finding 30 is supported by substantial evidence.

### 3. *Timing and Relationship*

Carr challenges finding 41 which provides:

> That though [AB] disclosed to family members, there is nothing to indicate that she had anything to gain by disclosing or that she did gain anything by disclosing.

CP at 75. Carr also challenges finding 18 which provides:

> That when [AB] disclosed to both [EB] and [KF], the Defendant was no longer living in the house.

CP at 73.

KF and EB testified that Carr had already moved out when AB told them about the incidents. And AB testified that she waited until after he moved out before telling KF because she wanted Carr to be completely out of her life before doing so, indicating that she had nothing to gain by telling. Further, unchallenged finding 25 is a verity on appeal; it says that there was no evidence that AB was in trouble or seeking attention when she disclosed what happened to EB and KF. Substantial evidence supports findings 18 and 41.

### 4. *The Circumstances Surrounding the Statements*

Carr argues that the trial court erred in entering findings 55 and 56 which provide:

> That AB testified that she did not know why she talked to Ms. Mangahas, demonstrating that she was unaware her statements would be used to prosecute the Defendant.

8

. . . .

> That while the Court is aware that one of Ms. Mangahas'[s] roles is to investigate, it is clear that AB did not have any knowledge of Ms. Mangahas'[s] role when she collected her statement.

CP at 76. AB testified that she knew that her mom had called the police but she also stated twice that when she talked to Mangahas she did not know why. Findings 55 and 56 are supported by AB's testimony.

Carr argues that the trial court erred in entering conclusion 4 which provides "[t]hat [AB]'s statements to Ms. Mangahas were not testimonial and are therefore admissible at trial." CP at 77. We review this conclusion de novo to determine whether the findings support the conclusion. *B.J.S.*, 140 Wn. App. at 97; *Alvarez*, 105 Wn. App. at 220. Findings 55 and 56 support this conclusion. And Carr does not explain why the trial court erred or why we should determine that AB's statements to Mangahas were testimonial. And, because AB was available and testified at trial, *Crawford*[6] and the confrontation clause are not implicated. *State v. Price*, 158 Wn.2d 630, 633, 146 P.3d 1183 (2006).

In sum, substantial evidence supports the trial court's findings and the findings support the trial court's conclusion that AB's pretrial statements are reliable. Accordingly, the trial court did not abuse its discretion.

---

[6] *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

## II. CROSS-EXAMINATION OF WITNESSES

Next, Carr argues that the trial court abused its discretion and violated his constitutional right to cross-examine witnesses when it excluded witness testimony that AB had a habit of lying. But under RAP 2.5, Carr failed to preserve this alleged error for review.

The State moved in limine to exclude any testimony from KF and EB about AB's credibility. Carr responded that he anticipated that AB's "potential or history of telling lies may become an issue." VRP (June 6, 2011) at 11. The court then stated:

> All right. What I am going to do is that I am going to restrict both parties to the colloquy that is issued by Carl [sic] Tegland with respect to reputation evidence of truthfulness.
> [Carr], if you believe that 404(b) evidence like telling lies or prior acts of lying becomes relevant because you think that the State has opened the door, I ask that you simply take this matter up before you start questioning so you can get a further ruling from the [c]ourt.

VRP (June 6, 2011) at 11-12. Carr agreed.

However, at trial, Carr never asked KF or EB about AB's habit of lying nor did Carr ask the trial court to further rule on the issue. Thus, the matter was not preserved for review.

## III. SUFFICIENCY OF EVIDENCE

Carr argues that insufficient evidence supports his convictions because (1) nowhere at trial, except for Mangahas's testimony, did the State present evidence of penetration; (2) the State asked AB leading questions; and (3) the jury must have been confused because they asked for the definition of vagina during deliberations. We reject these arguments.

Evidence is sufficient to support a conviction if it permits a reasonable fact finder to find each element of the charged crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). An insufficiency claim admits the truth of the State's evidence and all

reasonable inferences that can be drawn. *State v. Drum*, 168 Wn.2d 23, 35, 225 P.3d 237 (2010). We defer to the trier of fact on issues of conflicting testimony, witness credibility, and the evidence's persuasiveness. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

To establish that Carr committed two counts of first degree child rape, the State had to prove that on two occasions (1) Carr had sexual intercourse with AB, (2) AB was less than 12 years old and not married to Carr, (3) Carr was more than 24 months older than AB, and (4) the acts occurred in Washington. RCW 9A.44.073. The definition of sexual intercourse includes "any penetration of the vagina or anus however slight, by an object, when committed on one person by another." RCW 9A.44.010(1)(b).

At trial, AB testified that (1) she was in her room one night when Carr came in and put his hand up her shorts and underwear and started touching the inside of her privates with his two fingers; (2) Carr did the touching once, left her room, and then came back a few minutes later and did the same touching another time; (3) AB was eight years old when the acts occurred and that Carr was her mom's boyfriend at the time; and (4) the acts occurred in her family's home in Bremerton, Washington. VRP (June 9, 2011) at 82. Several other people also testified at trial that AB told them about Carr's touching. Mangahas, the State's child interviewer, testified that AB told her in their interview that Carr put his fingers inside her genitalia area two times, and that the two acts occurred several minutes apart. AB's mother and AB's brother testified that AB told each of them that Carr had touched her private parts at their Bremerton home. Also,

No. 42416-9-II

Durkee, Carr's private investigator, testified about her interview with AB and that AB told her about Carr's touching and that it happened twice.

Further, Carr's initial assertion concedes the very argument he attempts to make. He acknowledges that Mangahas testified that Carr penetrated AB. This alone, taken in the light most favorable to the State could support a reasonable inference that Carr penetrated AB. Mangahas testified that AB told her in their interview that Carr put his fingers inside her genitalia area two times.

Next Carr argues that there was insufficient evidence because AB's testimony was the result of the State's leading questions. The general rule is that we will not consider issues raised for the first time on appeal. RAP 2.5(a);[7] *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). The purpose behind issue preservations rules is to encourage the efficient use of judicial resources "by ensuring that the trial court has the opportunity to correct any errors, thereby avoiding unnecessary appeals." *State v. Robinson*, 171 Wn.2d 292, 304-05, 253 P.3d 84 (2011). Carr did not object to AB's testimony as leading.[8] Had Carr objected, the court could have corrected the alleged error but because he did not object, he has failed to preserve the issue on appeal.

---

[7] RAP 2.5(a) provides exceptions for manifest error affecting a constitutional right, lack of trial court jurisdiction, and the failure to establish facts upon which relief can be granted; none of which apply here.

[8] Carr objected one time during AB's testimony. When AB was testifying about her conversation with EB, she said that at first EB did not believe her because Carr has daughters of his own. AB told EB that Carr probably loved his own daughters but did not love her. Carr objected as beyond the scope of the question and the court directed the State to ask another question.

12

Finally, Carr argues that the jury was confused about whether penetration occurred because they asked for the definition of vagina. We presume that the jury follows the trial court's instructions and properly found that penetration occurred based on the court's definition of vagina and the elements of rape. *State v. Grisby*, 97 Wn.2d 493, 499, 647 P.2d 6 (1982), *cert. denied*, 459 U.S. 1211 (1983). And Carr does not cite any authority supporting his argument that a question from the jury somehow amounts to insufficient evidence.

Taken in the light most favorable to the State, the evidence supports a reasonable inference that Carr committed two counts of first degree child rape. His arguments to the contrary fail.

## IV. SENTENCING CONDITIONS

Carr challenges two of the trial court's sentencing conditions: (1) the no-contact order with children and (2) the polygraph testing. His arguments are unpersuasive.

### A. No-Contact Order

Carr argues that the no-contact order (1) violates his fundamental right to parent his children because there was no evidence that Carr ever abused his own children[9] or was a danger to them, and (2) violates his constitutional right to freedom of association because the order was purely punitive and not sensitively imposed. We disagree.

We review sentencing conditions for an abuse of discretion. *State v. Riley*, 121 Wn.2d 22, 37, 846 P.2d 1365 (1993). A sentencing court abuses its discretion if its decision is

---

[9] At the time of the presentence investigation report, Carr had three biological children, an 11-year-old son who lives with his mother in Port Orchard and two daughters, ages 11 and 9, who live with their mother in Massachusetts.

13

manifestly unreasonable, meaning it is beyond the court's authority to impose, or if exercised on untenable grounds or for untenable reasons. *Riley,* 121 Wn.2d at 37; *State v. Corbett,* 158 Wn. App. 576, 597, 242 P.3d 52 (2010); *see State v. Jones,* 118 Wn. App. 199, 208, 76 P.3d 258 (2003). Sentencing courts may impose crime-related prohibitions for a term of the maximum sentence to a crime, independent of conditions of community custody. *State v. Armendariz,* 160 Wn.2d 106, 118-19, 156 P.3d 201 (2007). Crime-related prohibitions directly relate to the circumstances of the crime. RCW 9.94A.030(10).[10] We typically uphold sentencing conditions if reasonably crime related. *Riley,* 121 Wn.2d at 36-37.

Further, sentencing courts must sensitively impose conditions interfering with one's fundamental rights. *Riley,* 121 Wn.2d at 37. Rights to marriage and to the care, custody, and companionship of one's children are fundamental constitutional rights, and we subject any state interference with those rights to strict scrutiny. *State v. Warren,* 165 Wn.2d 17, 34, 195 P.3d 940 (2008), *cert. denied,* 129 S. Ct. 2007, 173 L. Ed. 2d 1102 (2009). But parental rights are not absolute and may be subject to reasonable regulation. *Corbett,* 158 Wn. App. at 598. A sentencing court may restrict a convicted defendant's fundamental parenting rights "by conditioning a criminal sentence if the condition is reasonably necessary to further the State's compelling interest in preventing harm and protecting children." *Corbett,* 158 Wn. App. at 598.

Because Carr abused his parenting role by sexually abusing a minor in his care and living in his home, the no contact with minors provision is appropriate. *Corbett,* 158 Wn. App. at

---

[10] RCW 9.94A.030 has been amended several times since Carr's offense, but the section we cite has not changed.

599.[11] Further, Carr argues that the no-contact order violated his freedom of association and was purely punitive and not sensitively imposed, relying on *State v. Riley*, 121 Wn.2d 22, 37-38, 846 P.2d 1365 (1993). But *Riley* involved convictions for computer trespass, making it obviously distinguishable from the Carr's child rape convictions. 121 Wn.2d at 38. And, the sentencing court's condition that prohibited Riley from associating with other computer hackers was upheld as reasonably necessary to prevent Riley from further criminal conduct during the duration of his sentence. *Riley*, 121 Wn.2d at 38.

Likewise, Carr's prohibition on contact with minors is undoubtedly reasonably necessary to prevent Carr from further criminal conduct involving children and Carr does not cite a single case that is factually similar where the opposite conclusion was reached. And Carr ignores the Supreme Court's ruling in *State v. Riles*, that no-contact provisions for defendants that have been convicted of a sex offense against a child do not violate the defendant's freedom of association. 135 Wn.2d 326, 342, 957 P.2d 655 (1998), *abrogated on other grounds*, *State v. Valencia*, 169 Wn.2d 782, 239 P.3d 1059 (2010).

We hold that the sentencing court's no-contact condition was reasonably necessary to further the State's compelling interest in preventing harm and protecting children. The trial court did not err in prohibiting Carr from contact with minors.

---

[11] Relying on *State v. Letourneau*, Carr argues that the no-contact order was not reasonably necessary to protect his children. 100 Wn. App. 424, 997 P.2d 436 (2000). But *Letourneau* is readily distinguishable because Letourneau did not sexually abuse a child living in her home. 100 Wn. App. at 429. We reject Carr's his arguments relying on *Letourneau*.

B. Polygraph Testing

Next, Carr argues that the trial court improperly ordered him to submit to polygraph testing, which is prohibited by RCW 9.94A.030(10). Again we disagree.

RCW 9.94A.030(10) provides:

"Crime-related prohibition" means an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted, and shall not be construed to mean orders directing an offender affirmatively to participate in rehabilitative programs or to otherwise perform affirmative conduct. However, affirmative acts necessary to monitor compliance with the order of a court may be required by the department.

Also, RCW 9.94A.505(8) allows affirmative conduct: "As part of any [felony] sentence, the court may impose and enforce crime-related prohibitions and affirmative conditions as provided in this chapter." In addition, RCW 9.94A.703(3) allows a sentencing court to impose affirmative conditions as part of a community custody sentence. It may order an offender to "[p]articipate in rehabilitative programs or otherwise perform affirmative conduct reasonably related to the circumstances of the offense, the offender's risk of reoffending, or the safety of the community." RCW 9.94A.703(3)(d). Thus the trial court properly ordered Carr to submit to polygraph testing.

Carr cites *In re the Detention of Hawkins*, to argue that trial courts cannot order polygraph exams. 169 Wn.2d 796, 799, 238 P.3d 1175 (2010). But *Hawkins* is distinguishable because it involved the use of pretrial polygraphs to determine whether Hawkins was a sexually violent predator, not polygraphs as sentencing conditions. 169 Wn.2d at 799.

Contrary to Carr's arguments, in *Riles*, our Supreme Court upheld polygraph testing for sex offenders as "*an important asset in monitoring the sex offender client in the community.*"

16

*Riles*, 135 Wn.2d at 342.[12]  Thus we reject Carr's arguments that ignore *Riles's* holding.  135 Wn.2d at 342.  We hold that polygraph testing was an appropriate community custody condition for Carr, a convicted sex offender, pursuant to RCW 9.94A.030(10), .505(8), .703(3), and *Riles*.

In sum, Carr's arguments, if preserved, are not persuasive.  We conclude that there was no error, thereby also rejecting Carr's cumulative error claim.  Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Johanson, J.

We concur:

_____
Worswick, C.J.

_____
McCarthy, J.P.T.

---

[12] Our legislature has amended the sentencing statutes numerous times, but the relevant statutory language—that the legislature intended to allow polygraphs for monitoring compliance with sentencing conditions—remains in effect.  *See* RCW 9.94A.030(10) (allowing "affirmative acts necessary to monitor compliance with the order of a court").